## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

_____

_In re:_ APPLICATION OF
HULLEY ENTERPRISES LTD., YUKOS
UNIVERSAL LTD., AND VETERAN
PETROLEUM LTD., FOR AN ORDER
PURSUANT TO 28 U.S.C. § 1782 TO
CONDUCT DISCOVERY FOR USE IN A
FOREIGN PROCEEDING

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:18-MC-435-GBD

## DECLARATION OF ROB S. MEIJER[1]

I, Rob S. Meijer, declare as follows:

1.      I am a lawyer admitted to practice in the Netherlands.  I work in the Amsterdam office of a law firm named Houthoff, where I first became a partner in 1988.[2]

2.      I advise the Russian Federation's lead counsel and sole counsel of record, Prof. Albert Jan van den Berg, on all aspects of Dutch civil procedural law in Case No. 200.197.079/01 before the Court of Appeal of The Hague (the "Dutch Court of Appeal"). Previously, I also provided advice to Prof. van den Berg regarding similar issues in the underlying litigation before the District Court of The Hague (the "Dutch District Court").  In the

---

[1] This Declaration is submitted in connection with proceedings in both New York and Pennsylvania.  Unless otherwise indicated, all docket citations to Case No. 1:18-MC-435-GBD (S.D.N.Y.).  With respect to the individual document requests, this Declaration reflects the numbering used in the New York subpoena (ECF No. 2-1 at 18-19), which differs slightly from the numbering in the Pennsylvania subpoena (Case No. 2:18-MC-00176 (E.D. Pa.), ECF No. 1-3, at 20).

[2] In 1999, Houthoff merged with Buruma Maris to create "Houthoff Buruma."  In 2017, the law firm was then formally redesignated again as "Houthoff."  During my three decades at Houthoff, my practice has focused on civil litigation in the Dutch courts, with an emphasis on appellate and Supreme Court ("cassation") litigation.  I am a former Chairman of the Netherlands Bar Association's Advisory Committee on Civil Law, and am currently a member of the Advisory Committee on Cassation.  For more than fifteen years, I have been listed as a Tier 1 "leading individual" in Dispute Resolution (Netherlands) in Chambers Europe and Chambers Global.  For further details, I refer to my CV, attached as Ex. RSM-19.

ongoing appellate proceedings, the Russian Federation is opposed by the appellants, Hulley Enterprises Ltd. ("HEL"), Veteran Petroleum Ltd. ("VPL"), and Yukos Universal Ltd. ("YUL") (collectively "HVY").[3]

3.     In Case No. 200.197.079/01, HVY are presently challenging a judgment rendered by the District Court of The Hague (the "Dutch District Court") on April 20, 2016.[4]   In that judgment, the Dutch District Court granted the Russian Federation's request to annul six arbitration awards, including the three Interim Awards and the three Final Awards, issued by arbitrators sitting in The Hague under the Energy Charter Treaty ("ECT").[5]   In the Final Awards, the arbitrators had directed the Russian Federation to pay more than US$ 50 billion in damages to HVY based on the Russian Federation's alleged expropriation of the value of HVY's shares in OAO YUKOS Oil Company ("YUKOS").   As the Dutch District Court explained, however, the Russian Federation had never actually offered to arbitrate with HVY under Articles 45(1) and 26 of the ECT, such that these six arbitration awards were annulled and thus ceased to exist within the Dutch legal system.[6]   Because the arbitration had been seated in The Hague, the Dutch courts are the exclusive jurisdiction for the annulment of the arbitration awards (although other courts in other jurisdictions may "recognize" and "enforce" the arbitration awards under the New York Convention of 1958).

4.     I respectfully submit this Declaration in connection with the Oppositions filed by White & Case LLP, Mr. Hugh Verrier, and Ms. Alexandra Rutstein in respect of HVY's applications under Section 1782.[7]   In this Declaration, I address certain matters relating to Dutch law and Dutch legal procedure raised in HVY's applications and the accompanying Declaration of Mr. Marnix Leijten.

---

[3] These same three entities are also the applicants in the ongoing proceedings under Section 1782 in New York and Pennsylvania.

[4] *See* District Court of The Hague, Apr. 20, 2016 (Veteran Petroleum Ltd., Yukos Universal Ltd., Hulley Enter. Ltd./The Russian Federation), Leijten Decl. Ex. 3, ECF No. 2-2 at 644.

[5] *Id.* ¶ 6.

[6] *Id.* ¶¶ 5.95–5.96.

[7] In 2017, I previously provided a declaration regarding the Dutch litigation in Case No. 200.197.079/01 and relevant Dutch legal issues in the proceedings before the U.S. District Court for the District of Columbia under Section 1782. *See* Meijer Decl., In Re Application of Hulley Enter. Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 1:17-MC-01466-BAH (D.D.C. July 17, 2018), ECF No. 11-17.

5.      In Part I of this Declaration, I begin by providing the relevant background and context, including the procedural history of the original arbitration in The Hague and the subsequent litigation in the Dutch courts.

6.      In Part II, I then address each of the following individual issues pertaining to Dutch law and legal procedure:

(i)      First, four of HVY's document requests (Nos. 1, 2, 3, and 5)[8] reflect attempts to circumvent Article 843a of the Dutch Code of Civil Procedure ("DCCP") because all or most of these documents could have previously been requested directly from the Russian Federation in the Dutch litigation.  As reflected in the Russian investigators' 2007 protocols, these documents have been in the Russian Federation's possession for more than ten years, in most instances because they were obtained from Haynes & Boone LLP's Moscow office on May 7, 2007 (about three weeks before another search took place at White & Case's Moscow office on May 30, 2007).[9]

HVY has presumably known about the Russian Federation's possession of these documents because one of the Oligarchs comprising HVY's principals, Mr. Platon Lebedev, has given HVY access to the criminal investigative file (as described in the declaration of Mr. Cotlick[10] and further detailed below).  Accordingly, HVY

---

[8] Shepard Decl. Ex. 2 Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1 (listing "**Request For Production No. 1**: All Documents in the Identified Clients' Case Files relating to the Yukos Shares Due Diligence Project"; "**Request For Production No. 2**: All Documents disclosed or provided to the Russian Federation relating to Petitioners or Yukos, including documents provided in connection with the May 2007 Resolution of Search"; "**Request For Production No. 3**: All Communications with Yukos and the Russian Federation relating to the Resolution of Search, relating to the search of White & Case's Moscow office on or about May 2007, or relating to any other transfer of documents to the Russian Federation"; and "**Request for Production No. 5**: All Documents in Identified Clients' Case Files that relate to any investigation of the 'title' to Yuko Shares").

[9] *Compare* Prosecutor General's Office of the Russian Federation, Protocol of Inspection of Documents from Haynes and Boone (May 14, 2007) (describing the May 7, 2007 search of Haynes and Boone's Moscow office) (Ex. RSM-7) *with* Prosecutor General's Office of the Russian Federation, Search Protocol of Documents from White & Case (May 30, 2007) (Cotlick Ex. 8-T), ECF No. 2-26, at 4 (describing the May 30, 2007 search of White & Case's Moscow Office).

[10] Cotlick Decl. ¶¶ 1, 3, 8–9, ECF No. 2-22.  Notably, although Mr. Lebedev and Mr. Khodorkovsky were convicted of tax evasion and fraud in 2005 and 2010, they were both subsequently pardoned and freed from prison in December 2013 and January 2014.  Accordingly, Mr. Lebedev and Mr. Khodorkovsky have both been free to assist HVY with evidence during all stages of HVY's post-arbitration litigation in the Netherlands and elsewhere, in the manner described in Mr. Cotlick's Declaration.

had numerous opportunities since the Dutch litigation commenced in 2014 to make the same requests (Nos. 1, 2, 3, and 5) to obtain documents from the Russian Federation under Article 843a of the DCCP.  HVY, however, has consistently refrained from making any such requests in the Dutch litigation.

(ii)    Second, four of HVY's document requests (Nos. 2, 3, 4, and 7)[11] seek documents that are entirely unrelated to any issues in dispute before the Dutch Court of Appeal.  Each of these document requests relate to alleged interactions between White & Case and HVY or their affiliates, or alleged interactions between White & Case and the Russian Federation.

(iii)    Third, three of HVY's document requests (Nos. 1, 5, and 6)[12] seek documents that would lack any probative value in the Dutch proceedings.  The evidentiary record demonstrates unmistakably that HVY's principals routinely deceived their professional advisors at PricewaterhouseCoopers ("PWC"), Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), and Clifford Chance LLP regarding precisely these same topics during this same period.  Any legal advice provided by White & Case based on the habitual false statements and material omissions of HVY's principals would be disregarded by the Dutch Court of Appeal.

(iv)    Fourth, with respect to HVY's requests to cross-examine the current and former attorneys of White & Case, these requests would be wholly improper in the Netherlands.  Several provisions of Dutch law prohibit attorneys from disclosing information that is entrusted to them by their clients.

---

[11] Shepard Decl. Ex. 2, Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1 (listing "**Request for Production No. 2**: All Documents disclosed or provided to the Russian Federation relating to Petitioners or Yukos, including documents provided in connection with the May 2007 Resolution of Search"; "**Request for Production No. 3**: All Communications with Yukos and the Russian Federation relating to the Resolution of Search, relating to the search of White & Case's Moscow office on or about May 2007, or relating to any other transfer of documents to the Russian Federation"; "**Request for Production No. 4**: All Documents in the Identified Clients' Case Files that are Communications with Petitioners"; and "**Request for Production No. 7**: All Engagement Letters with the Identified Clients").

[12] Shepard Decl. Ex. 2, Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1 (listing "**Request for Production No.1**: All Documents in the Identified Clients' Case Files relating to the Yukos Shares Due Diligence Project"; "**Request for Production No. 5**: All Documents in Identified Clients' Case Files that relate to any investigation of the 'title' to Yuko Shares"; and "**Request for Production No. 6**: All Documents in Identified Clients' Case Files that relate to the Tempo Agreements").

## I.    BACKGROUND

7.    As explained in their Section 1782 applications, HVY's sole basis for requesting documents is as follows: "[HVY] expect the evidence obtained in the discovery requested herein will refute the Russian Federation's 'unclean hands' allegations."[13]    Specifically, HVY seek evidence to demonstrate "that the Yukos privatization, related transactions, and subsequent transfers of shares, were lawful."[14]    In HVY's view, "[t]his discovery will assist Petitioners to refute the 'unclean hands' allegations that are now part of the record before the Dutch Appellate Court."[15]

8.    For context, therefore, it is useful to recall when and where the Russian Federation actually began to raise its arguments and proffer evidence with respect to HVY's "unclean hands."    It is also useful to understand where the Russian Federation's arguments regarding HVY's "unclean hands" fit within the full range of grounds for annulment raised by the Russian Federation under Article 1065 of the DCCP during the post-arbitration litigation before the Dutch District Court and the Dutch Court of Appeal.

9.    In fact, the Russian Federation first raised its "unclean hands" arguments on October 15, 2005, at the outset of the arbitration in The Hague.[16]    This was almost nine years before I first became involved in the Dutch component of the Russian Federation's case against HVY.[17]    This was nearly ten years before White & Case was first retained by the Russian

---

[13] Memorandum of Law in Support of *Ex Parte* Application by Hulley Enterprises Ltd., Yukos Universal LTD., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1786 to conduct Discovery for Use in a Foreign Proceeding at 2, ECF No. 2 [hereinafter HVY Motion for Discovery].

[14] *Id.*

[15] *Id.*

[16] Court of Appeal in The Hague, Interim Judgment ¶ 4.2.2, Sept. 25, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd., Hulley Enter. Ltd./The Russian Federation) [hereinafter Dutch Interim Judgment] (Ex. RSM-16).

[17] I did not participate in the original arbitration proceedings between HVY and the Russian Federation, which began in February 2005 and concluded in July 2014.    My involvement began in mid-2014, when I began to advise the Russian Federation's lead counsel on matters of Dutch procedural law during the initial phase of post-arbitration litigation before the Dutch District Court.    Over the last four years, my work on this case has caused me to become closely familiar with the record in the underlying arbitration in The Hague and, to a somewhat lesser extent, certain translated sections of the record in the Russian criminal proceedings against HVY's principals, including Mr. Platon Lebedev and Mr. Mikhail Khodorkovsky, in Criminal Case No. 18/432766-07 and other criminal cases.

Federation to defend against HVY's efforts to enforce the 2014 arbitration awards in the courts of Germany, the United Kingdom, and the United States.

10.    Over the course of the arbitration in The Hague, the Russian Federation reiterated its "unclean hands" arguments and provided supporting evidence in a series of multiple written and oral submissions to the arbitrators in 2006, 2011, and 2012.

11.    Notably, throughout the arbitration proceedings, both the Russian Federation and HVY drew extensively from the evidence compiled during the then-ongoing Russian criminal proceedings against HVY's principals, the so-called Russian Oligarchs named Mr. Platon Lebedev and Mr. Mikhail Khodorkovsky, which were unfolding in parallel at this time.  In this current U.S. litigation, an attorney for HVY named Mr. Michael Cotlick has now expressly acknowledged that HVY's principal, Mr. Lebedev, has directly provided at least four documents from the record of the criminal proceedings ("Criminal Investigation File no. 18/432766-07") to be used by HVY's lawyers.[18]

12.    The chronology of the Dutch arbitration was addressed in detail by the Dutch Court of Appeal in an Interim Judgment rendered on September 25, 2018.[19]  As to the Russian Federation's arguments regarding HVY's "unclean hands," the relevant sequence of events is as follows:

(i)    **October 15, 2005** – In response to HVY's Notice of Arbitration, the Russian Federation submitted its initial pleading, the Statement of Defence, to the arbitrators seated in The Hague.[20]  This initial pleading expressly raised the Russian Federation's defenses with respect to HVY's "unclean hands."[21]

---

[18] Cotlick Decl. ¶¶ 1, 3, 8–9, ECF No. 2-22.  Notably, although Mr. Lebedev and Mr. Khodorkovsky were convicted of tax evasion and fraud in 2005 and 2010, they were both subsequently pardoned and freed from prison in December 2013.  Accordingly, Mr. Lebedev and Mr. Khodorkovsky have both been free to assist HVY with evidence during all stages of HVY's post-arbitration litigation, in the manner suggested in Mr. Cotlick's Declaration.

[19] *See* Dutch Interim Judgment ¶¶ 2.1–2.8 (Ex. RSM-16) (providing a summary of major events "as relevant at this stage of the proceedings").

[20] *Id.* ¶ 4.2.2.

[21] *Id.* ¶¶ 4.2.2., 4.2.5.

(ii)　**February 28, 2006** – The Russian Federation began to develop the "unclean hands" argument in its First Memorial.[22]  As the Russian Federation explained, HVY's principals and their now-defunct financial institution ("Bank Menatep") had participated in "criminal schemes, in particular in relation to the privatization" of YUKOS in 1995 and 1996.[23]

Specifically, HVY's principals and Bank Menatep had used shell companies called "Laguna" and "Monblan" to manipulate a series of rigged auctions for "the state-owned Russian oil company Yukos as part of the loans-for-shares program" in 1995 and 1996.[24]

(iii)　**July 29, 2011** – The Russian Federation subsequently provided the principal evidence for these "unclean hands" arguments in its Counter-Memorial:

a.　In this pleading, the Russian Federation carefully described the "fraudulent acquisition of Yukos," which HVY's principals arranged in 1995 and 1996 through a rigged privatization involving a group of "front companies," including "Laguna" and "Monblan."[25]

b.　For the first time, the Russian Federation's Counter-Memorial also raised the issue of the sham contracts (which HVY now call the "Tempo Agreements")[26] concluded by YUL in connection with the Yukos privatization.  As the Russian Federation explained, YUL used the Tempo Agreements as a pretext to pay the bribes that had been promised to "Messrs. Muravlenko, Golubev,

---

[22] *Id.* ¶ 4.2.2.

[23] Hulley Enter. Ltd. vs. The Russian Federation, Perm. Ct. Arb. Case No. AA 226, First Memorial on Jurisdiction and Admissibility, ¶¶ 148, 152 (Feb. 28, 2006).

[24] *Id.* ¶ 152.

[25] Hulley Enter. Ltd., Yukos Universal Ltd., Veteran Petroleum Ltd. vs. The Russian Federation, Perm. Court. Arb. Case Nos. AA 226, 227, and 228, Respondent's Counter-Memorial, ¶ 28 (July 29, 2011) ("As a result, [HVY's principals] completely rigged the auction both by preventing any genuine competition and by affording [HVY's principals] a preferred position, all in order to serve [their] own interests.") [hereinafter Russian Federation Counter-Memorial] (Ex. RSM-9).

[26] I adopt this term, which is based on the name of one of the Red Directors' shell companies.  This term was not used by the Russian Federation during the arbitration, but now is presently used by HVY and Marnix Leijten.

Ivanenko, and Kazakov,"[27] the so-called "Red Directors" who had been appointed by the Government to manage YUKOS and supervise its privatization.[28]

As the Russian Federation summarized in its Counter-Memorial, the evidence demonstrated that "the true purpose" of the Tempo Agreements was to pay "a 'kickback' that had been previously promised to [the Red Directors] for helping [the Russian Oligarchs] acquire Yukos during the loans-for-shares program."[29]

Later in 2011, HVY disclosed YUL's bank records pursuant to the arbitrators' document disclosure order.[30]   These bank records confirmed the Russian Federation's contention that YUL had made verifiable payments totaling at least US$ 600 million to Tempo Finance Ltd., the shell company owned and operated by the four Red Directors.[31]

(iv)   **August 16, 2012** – The following year, the Russian Federation then submitted a Rejoinder, in which it reasserted its "unclean hands" arguments and supplemented the evidentiary record before the arbitrators:

a.   With respect to the YUKOS privatization generally, the Russian Federation reiterated that HVY's principals had "us[ed] shell company proxies to feign competition in the loans-for-shares auction and a simultaneous investment tender for Yukos shares" in 1995 and 1996.[32]

b.   With respect to the so-called Tempo Agreements, the Russian Federation reiterated that HVY's principals had used these sham contracts between YUL

---

[27] Russian Federation Counter-Memorial ¶ 36 (Ex. RSM-9).

[28] Leijten Decl. Ex. 6, Expert Report of Professor Mark Pieth Analyzing Documentary Evidence of Bribery, Corruption, and Money Laundering Pertaining to the Privatization of OAO YUKOS Oil Company at 7, ¶¶ 11–22, ECF No. 2-19. [hereinafter Pieth Expert Report 1].

[29] Russian Federation Counter-Memorial ¶ 36 (Ex. RSM-9).

[30] Bank Statements of Yukos Universal Ltd. (2001–2003) (Ex. RSM-2).

[31] Pieth Expert Report 1 at 28, ¶ 70.

[32] Hulley Enter. Ltd., Yukos Universal Ltd., Veteran Petroleum Ltd. vs The Russian Federation, Perm. Ct. Arb. Case Nos. AA 226, 227, and 228, Respondent's Rejoinder on the Merits, ¶ 1435(ii) (Aug. 16, 2012) (Ex. RSM-10).

and the Red Directors to fulfill the "secret promise of payoffs"[33] made years before the Tempo Agreements were actually committed to paper.

c.  The Russian Federation also exhibited an investigative transcript ("Exhibit RSM-5") recording Russian investigators' interview with Mr. Gitas Anilionis, a former employee of HVY's principals, on January 18, 2007.[34]  In this transcript, Mr. Anilionis described the entire chain of transactions by which a "major volume" of YUKOS shares was transferred from the Russian shell companies (Laguna and Monblan) through several layers of offshore shell companies between 1998 and 2000.[35]

As detailed by Mr. Anilionis, the names of these offshore shell companies were "MQD," "Candal," "Ibncrown," "Avimor," "Medusa Shipping," "Temerian," "Barion," "Gayard," "Kinside," and "Wandsword."  In the final set of transactions, as Mr. Anilionis explained, the Yukos shares then "went up to '[Hulley Enterprises Ltd]' as the result of sales to '[Hulley Enterprises Ltd]' subsidiaries" in Cyprus.[36]

(v)  **October 1, 2012** – In preparation for the 2012 arbitration hearing, the Russian Federation submitted a so-called "Skeleton Argument" to assist the arbitrators' review of the evidence.[37]  Here again, the Russian Federation reiterated that "[t]he Oligarchs who controlled [HVY] acquired and consolidated their investments in Yukos through illegal acts and bad faith conduct . . . ."[38]

(vi)  **November 6, 2012** – During the 2012 arbitration hearing, the Russian Federation repeated this "unclean hands" argument in its oral pleadings:

---

[33] *Id.* at 675 n.2462.

[34] *See* Prosecutor General's Office of the Russian Federation, Protocol of Witness Interview with Gitas Pavilo Anilionis (Jan. 18, 2007) (Ex. RSM-5).

[35] *Id.* at 33.

[36] *Id.* at 34.

[37] *See* Hulley Enter. Ltd., Yukos Ltd., Veteran Petroleum Ltd., vs. The Russian Federation, Perm. Ct. Arb. Case Nos. AA 226, 227 and 228, Russian Federation's Skeleton Argument ¶ 94 (Oct. 1, 2012) (Ex. RSM-11).

[38] *Id.* at 94.

a.  "[HVY], far from being innocent bystanders . . . form part of a vast network of shell companies set up and manipulated by their owners to serve various illegal purposes.  So, these illegal purposes include: obscuring the oligarchs' role in the acquisition, ownership and management of Yukos; avoiding legal restrictions and hiding illegalities in the process of acquiring Yukos . . . ."[39]

b.  "[T]he transfer of Yukos' shares to [HVY] was effected by a chain of secret transfers among other shell companies, culminating then in the transfer to [HVY] . . . ."[40]

c.  "Contrary to [HVY's] position, the serious illegalities that infect the entire process of the acquisition of the Yukos shares by [HVY] cannot simply be ignored because the transfer of the shares to [HVY] . . . viewed in isolation, is asserted to be legal.  These illegalities cannot somehow be cured through multiple transfers within this network of the oligarchs' offshore companies from one shell company to another . . . . [T]his conclusion applies a fortiori where a claimant is not unrelated to the persons or entities that committed these illegalities, but is an investment vehicle owned and controlled by the same persons who committed the illegalities . . . . Otherwise, investment treaty protection could be achieved simply by shifting investments through layers of ownership and control to launder illegal investments . . . ."[41]

(vii)  **December 21, 2012** – Finally, after the completion of the 2012 hearing, the Russian Federation repeated this argument once more in its Post-Hearing Brief. As the Russian Federation explained, "[t]he process by which [HVY] acquired their Yukos shares, through a chain of transfers among other shell companies, culminating in the transfer to [HVY], is infected by serious illegalities that

---

[39] Hulley Enter. Ltd., Yukos Ltd., Veteran Petroleum Ltd., vs. The Russian Federation, Perm. Ct. Arb. Case No. AA 226, Hearing on the Merits Transcript (Day 19), 169–176 (Nov. 6, 2012) (Ex. RSM-12).

[40] *Id.*

[41] *Id.*

exclude [HVY's] shares from protection under the ECT and render their claims inadmissible."[42]

13.    Already during the arbitration, therefore, the Russian Federation's arguments regarding HVY's "unclean hands" included all of the key factual and legal contentions reflected subsequently in the Russian Federation's arguments during the post-arbitration litigation in the Dutch courts.  As summarized recently by the Dutch Court of Appeal in its interim judgment, "[t]his course of the proceedings demonstrates . . . that the Russian Federation relied on the lack of a valid arbitration agreement before all defenses in the arbitration proceedings, but that it first substantiated this position at a later stage of the proceedings with the unclean hands argument."[43]

14.    On July 18, 2014, after a ten-year arbitration involving two separate rounds of document requests and document disclosure, the arbitrators sitting in The Hague issued their Final Awards.  The arbitrators declined to consider the Russian Federation's arguments regarding HVY's "unclean hands," either legally or factually, for reasons[44] that are now being disputed in the Dutch litigation.  Notably, the arbitrators' findings directly contradicted those of the European Court of Human Rights, which ruled in two separate judgments in 2011 and 2013 that the Russian Federation's assessments of taxes against Yukos were not based on any "alleged political motive," but rather reflected a legitimate application of Russian tax laws.[45]

15.    Shortly after the arbitrators rendered their Final Awards, the Russian Federation initiated litigation before the Dutch District Court and submitted a Writ of Summons requesting annulment on November 10, 2014.[46]  In these proceedings, the Russian Federation requested that

---

[42] Hulley Enter. Ltd., Yukos Ltd., Veteran Petroleum Ltd., vs. The Russian Federation, Perm. Ct. Arb. Case Nos. AA 226, 227 and 228, Respondent's Post-Hearing Brief, ¶ 148 (Dec. 21, 2012) (Ex. RSM-13).

[43] Court of Appeal in The Hague, Interim Judgment ¶ 4.2.3, Sept. 25, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd., Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-16).

[44] In the view of the Russian Federation, paragraph 1370 of the arbitrators' Final Awards is manifestly arbitrary and fundamentally illogical.  According to the arbitrators, it was unnecessary to evaluate the Russian Federation's arguments regarding the oligarchs' "unclean hands," because the oligarchs were allegedly "separate from" HVY. But the Russian Federation had argued (as explained above) that YUL itself had participated directly in the bribery, and that HEL and VPL had obtained their YUKOS shares "by a chain of secret transfers among other shell companies" controlled by the oligarchs at all times.  Whether the arbitrators ultimately agreed with the Russian Federation or not, the arbitrators had an obligation to consider these factual contentions (but they never did so).

[45] OAO Neftyanaya Kompaniya Yukos v. Russia, App. No. 14902/04, Judgment (Eur. Ct. H.R. Sept. 20, 2011); Khodorkovskiy and Lebedev v. Russia, Apps. Nos. 11082/06, 13772/05, Judgment (Eur. Ct. H.R. July 25, 2013).

[46] Dutch Interim Judgment ¶ 2.5 (Ex. RSM-16).

the Dutch District Court annul the arbitration awards based on each of the five grounds for annulment set forth in Article 1065 of the DCCP.  Although HVY's counsel, Mr. Leijten, suggests that the Russian Federation did not challenge the arbitrators' finding that the Russian Federation had unlawfully expropriated the assets of YUKOS,[47] the Russian Federation actually challenged each major component of the arbitrators' findings, as well as the arbitrators' basic competence to preside over the arbitration in the absence of an arbitration agreement.

16.    The Russian Federation designated Prof. Albert Jan van den Berg of the law firm, Hanotiau & van den Berg, to act as lead counsel in the post-arbitration litigation.  It was also during this period in mid-2014 that Houthoff, the law firm where I am a partner, was retained by the Russian Federation's lead counsel to advise regarding issues of Dutch law and Dutch legal procedure.  In mid-2015, the Russian Federation separately retained Mr. Andrea Pinna of De Gaulle Fleurance & Associés to defend against the Final Awards' enforcement in the courts of France, and retained Hanotiau & van den Berg to defend against the Final Awards' enforcement in the courts of Belgium.  During approximately the same six-month period, the Russian Federation also retained Carolyn B. Lamm and her colleagues at White & Case to defend against HVY's efforts to enforce the Final Awards in the courts of Germany, the United Kingdom, and the United States.[48]

17.    In each of these six national jurisdictions, the Russian Federation instructed its counsel to argue that the arbitrators had manifestly erred by failing to consider the factual basis for the arguments regarding HVY's "unclean hands."  In each of these six national jurisdictions, the Russian Federation primarily relied upon the same documentary evidence used during the arbitration in The Hague.  The Expert Reports of Prof. Mark Pieth, for example, are based on his expert analysis of these same documents (*e.g.*, the Tempo Agreements themselves and other materials) taken largely from the record of the arbitration or the Russian criminal proceedings.[49]

---

[47] Leijten Decl. ¶ 7, ECF 2-2.

[48] *See, e.g.*, Hulley Enter. Ltd., Yukos Ltd., Veteran Petroleum Ltd., vs. The Russian Federation, No. 14-CV-1996-BAH (D.D.C. Nov. 25, 2014).

[49] *See* Pieth Expert Report 1; Leijten Decl. Ex. 7, Expert Report of Professor Mark Pieth Analyzing Documentary Evidence of Bribery, Corruption, and Money Laundering Pertaining to the Privatization of OAO YUKOS Oil Company [hereinafter Pieth Expert Report 2].

18.    Indeed, as part of HVY's public-relations campaign, one of HVY's executives wrote an open letter to the *American Lawyer* in 2016, apparently seeking to use the origins of the Russian Federation's documentary evidence to HVY's strategic advantage.  According to HVY's executive, Mr. Timothy Osborne, the Russian Federation's arguments regarding HVY's unclean hands were all "based on the stalest of evidence."[50]  Specifically, as Mr. Osborne explained, "[i]n the arbitration, each and every aspect of Yukos' existence was examined—from the company's privatization in 1995–1996" to "the process by which [HVY] acquired their shares in the company."[51]    Mr. Osborne further stated that "the process by which Yukos' shares were transferred and consolidated outside of Russia . . . was . . . examined in the arbitration, as well as in the criminal proceedings against Mr. Khodorkovsky."[52]  Finally, Mr. Osborne emphasized that the Tempo Agreements ("the most direct evidence of a bribe") had been "fully aired not only in the criminal trial against Mr. Khodorkovsky in Russia, but also in the arbitration."[53]  (In regard to Mr. Osborne's statements, I emphasize again the Russian Federation's position that, although the <u>parties</u> did indeed "examine" these allegations and items of evidence during the arbitration, the <u>arbitrators</u> somehow failed to do so entirely.)

19.    In any event, each of these statements in Mr. Osborne's 2016 letter to the *American Lawyer* conflicted with the strategy that HVY would shortly thereafter adopt in the course of the Dutch litigation, as explained below:

(i)    On April 20, 2016, the Dutch District Court rendered a judgment annulling each of the six arbitration awards in their entirety.[54]  The basis for this decision was unrelated to the Russian Federation's arguments regarding HVY's "unclean hands," and rather resulted from the Russian legislature's decision not to ratify the ECT.  As the Dutch District Court explained, because the Russian Federation had not ratified the ECT, the Russian Federation actually never offered to arbitrate

---

[50] Tim Osborne, *Yukos and Russia: A Response to 'The Global Lawyer,'* THE AMERICAN LAWYER (Aug. 5, 2016, 1:38 PM) [hereinafter Osborne Letter] (Ex. RSM-14).

[51] *Id.*

[52] *Id.*

[53] *Id.* (quoting a previous article by Michael D. Goldhaber, *To Dodge $50 Billion Bill, Russia Comes Clean on Sale of the Century*, THE GLOBAL LAWYER (June 22, 2016, 7:01AM)).

[54] *See* Leijten Decl. Ex. 3 at 706, ¶¶ 5.95–5.97, ECF No. 2-2.

with HVY in the first place—such that no agreement to arbitrate was ever formed. The arbitrators therefore lacked authority to render the 2014 awards directing the Russian Federation to pay US$ 50 billion to HVY.

Accordingly, because the Dutch District Court annulled the arbitrators' awards in their entirety on this basis alone, the Dutch District Court was not obliged to address any of the other challenges raised in the Russian Federation's pleadings under Article 1065 of the DCCP, reflecting the Dutch courts' general adherence to the principle of judicial economy.  If ground "a" is sufficient to reach the claimant's remedy, then ground "b" will not be dealt with, irrespective of its strength or simplicity.

The Dutch District Court therefore did not address any aspect of the Russian Federation's arguments regarding HVY's "unclean hands."  Moreover, no other national court (*i.e.*, in Belgium, France, Germany, the United Kingdom, and the United States) has ever been given the opportunity to address these "unclean hands" arguments, because HVY subsequently withdrew or suspended each of these parallel enforcement proceedings in 2016 and 2017.

(ii)    On July 8, 2016, HVY appealed the Dutch District Court's judgment.  Over the course of 2017 and 2018, HVY then pursued a sustained strategy of attempting to block the Russian Federation from making its "unclean hands" arguments in the proceedings before the Dutch Court of Appeal.

Most recently, in a 2018 request to strike the "unclean hands" arguments from the Russian Federation's pleadings, HVY made four objections before the Dutch Court of Appeal.  First, HVY argued that the Russian Federation's "assertions were not put forward in the arbitration in due time."[55]  Second, HVY argued that the arbitrators' erroneous reasoning at paragraphs 1367 and 1370 of the Final Awards were not sufficiently "contested in the summons" submitted by the Russian Federation on November 10, 2014.[56]    Third, HVY argued that the

---

[55] Dutch Interim Judgment ¶ 4.1.5(a) (Ex. RSM-16).

[56] *See id.* ¶ 4.1.5(b).

Russian Federation's "assertions are in violation of due process of law."[57]  Fourth, HVY argued that the Russian Federation had "waived its right to base its claim on the unclean hands argument, or ha[d] forfeited this right."[58]

(iii)    On September 25, 2018, the Dutch Court of Appeal issued an Interim Judgment rejecting all four of HVY's objections to the Russian Federation's arguments regarding HVY's "unclean hands."[59]  As the Dutch Court of Appeal emphasized, "the unclean hands argument was not a new defense," and HVY had failed to articulate why "due process of law would oppose the combination of existing arguments, or to what extent this would unreasonably prejudice HVY in their defence."[60]  To the contrary, as described by the Dutch Court of Appeal in the Interim Judgment, the "unclean hands" argument had been raised not only in the Russian Federation's reply submission before the Dutch District Court, but "was also advanced in the context of the jurisdiction at a later stage of the arbitration" in 2011 and 2012.[61]  As the Dutch Court of Appeal explained further, "HVY had sufficient opportunity to respond to the unclean hands argument as put forward by the Russian Federation in the reply and further explained during the oral arguments."[62]  Indeed, in Mr. Osborne's words, each of these arguments was already "fully aired not only in the criminal trial against Mr. Khodorkovsky in Russia, but also in the arbitration."[63]

20.    Having rejected each of HVY's objections, the Dutch Court of Appeal then requested the parties' views regarding the further course of proceedings.  On October 16, 2018,

---

[57] *Id.* ¶ 4.1.5(c).

[58] *Id.* ¶ 4.1.5(d).

[59] *See id.* ¶ 7.1.  Notably, the Dutch Court of Appeal accepted one of HVY's procedural objections with respect to the Russian Federation's arguments regarding HVY's fraud on the arbitrators during the arbitration.  The Russian Federation should have commenced a parallel revocation proceeding, rather than seeking to add this objection to the annulment proceeding.  This argument about fraud upon the arbitrators, however, is entirely separate and distinct from the "unclean hands" arguments.

[60] *Id.* ¶ 4.2.7.

[61] *Id.* ¶ 4.2.5.

[62] *Id.* ¶ 4.4.3.

[63] Osborne Letter (Ex. RSM-14).

HVY submitted a proposal (formally dated October 23, 2018) as to how and when the parties should make further comments on one another's arguments and evidence in preparation for an oral hearing before the Dutch Court of Appeal in 2019.[64]   Significantly, HVY's proposed schedule did not identify any dates for the litigants to make document requests in the Dutch litigation, as detailed further below.   The Russian Federation is now preparing a responsive proposal in accordance with Dutch procedural rules.

## II.    ANALYSIS OF HVY'S REQUESTS BASED ON DUTCH LAW AND DUTCH LEGAL PROCEDURE

21.    The remainder of this Declaration addresses HVY's specific requests for documents and deposition testimony from the perspective of Dutch law and the procedural history of the arbitration in The Hague.

### A. Four of HVY's Requests for Documents (Nos. 1, 2, 3, and 5)[65] Seek to Circumvent Article 843a of the DCCP

22.    Article 843a of the DCCP empowers each litigant to petition a Dutch District Court or a Dutch Court of Appeal in an incidental proceeding (*incidentele vordering*) to direct an opposing litigant to disclose certain documents.[66]   To obtain documents under Article 843a of the DCCP, a requesting litigant must persuade the Dutch court (a) that the requesting litigant possesses a "lawful interest" in reviewing the disclosed documents, (b) that the requested documents are "sufficiently specified," and (c) that the documents pertain to a "legal relationship" to which the requesting litigant is a party.[67]

23.    This mechanism under Article 843a of the DCCP has been available to HVY at all times since the Russian Federation raised its "unclean hands" argument before the Dutch District Court.   HVY, however, has never attempted to make any requests for documents under Article

---

[64] *See* Court of Appeal in The Hague, Submission Containing a Proposal for the Further Course of the Proceedings ¶ 25(i), Oct. 23, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd. Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-18).  The proposal dated October 23, 2018, was submitted under a cover letter dated October 16, 2018.  *See* Court of Appeal in The Hague, Submission containing a proposal for the further course of the proceedings on the part of HVY, Oct. 16, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd. Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-17).

[65] Shepard Decl. Ex. 2 Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1.

[66] Dutch Code of Civil Procedure art. 843a.

[67] *Id.*

843a of the DCCP during the Dutch litigation.  Indeed, at a procedural hearing before the Dutch Court of Appeal on January 16, 2017, HVY expressly declined to make any such requests ("motions") for documents.[68]  Similarly, HVY's Statement of Appeal dated March 14, 2017, was not accompanied by any requests for documents under Article 843a of the DCCP.  Most recently, HVY's proposal to the Dutch Court of Appeal set forth a comprehensive timeline of suggested dates for the parties to comment on one another's evidence, submit additional evidence, and potentially brief additional issues during the remaining time before the final hearing in 2019.[69]  This proposal, however, did not include any potential dates on which HVY would petition the Dutch Court of Appeal with respect to document requests under Article 843a of the DCCP.

24.    It is striking that, although HVY has consistently refrained from making any effort to obtain evidence under Article 843a of the DCCP during the last four years of Dutch litigation, HVY has repeatedly made document requests under Section 1782 in parallel proceedings before four separate U.S. District Courts in the District of Columbia, Los Angeles, New York, and Pennsylvania.[70]  It is equally striking that, as regards HVY's current document requests (Nos. 1, 2, 3, and 5),[71] all or most of the responsive documents are known to be in the possession of the Russian Federation.  Significantly, it seems that HVY has been aware of this fact—at least since Mr. Platon Lebedev began giving HVY access to documentary evidence from

---

[68] Court of Appeal in The Hague, Record of the Appearance Before the Court of the Parties at 4, 16 Jan. 2017, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd. Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-15) ("The parties do not anticipate any motions at this stage. Counsel Ynzonides [on Behalf of HVY]: . . . As the matter stands, no motions will be presented from our side.").

[69] See Court of Appeal in The Hague, Submission Containing a Proposal for the Further Course of the Proceedings ¶ 25(i), Oct. 23, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd. Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-18).  The proposal dated October 23, 2018, was submitted under a cover letter dated October 16, 2018.  See Court of Appeal in The Hague, Submission containing a proposal for the further course of the proceedings on the part of HVY, Oct. 16, 2018, Case No. 200.079/01 (Veteran Petroleum Ltd., Yukos Universal Ltd. Hulley Enter. Ltd./The Russian Federation) (Ex. RSM-17).

[70] See In re: Application of Hulley Enter. Ltd. and Veteran Petroleum Ltd., for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 2:18-MC-00176-GJP (E.D. Pa. Sept. 21, 2018); In re: Application of Hulley Enter. Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 1:18-MC-00435 (S.D.N.Y. Sept. 17, 2018); In Re Application of Hulley Enter. Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 2:17-CV-07100-PA-E (C.D. Ca. Sept. 26, 2017); In Re Application of Hulley Enter. Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, No. 1:17-MC-01466-BAH (D.D.C. June 19, 2017).

[71] Shepard Decl. Ex. 2 Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1.

17

the criminal investigative files, as explained further below.  HVY thus could have made these same requests for documents to one of the Dutch courts under Article 843a of the DCCP. Several observations can be made in this regard, which are detailed below.

25.    First, HVY's Request No. 1 seeks documents "relating to the Yukos Shares Due Diligence Project" performed by White & Case.[72]  I understand, based on the investigative protocols found in the criminal investigative files, that eight volumes of these same documents (approximately 1600 pages) are known to be in the Russian Federation's possession.[73]  As reflected in a 2007 investigative protocol, the Russian investigators collected these eight volumes of "DOCUMENTS RECEIVED FROM W&C" during an inspection of the Moscow office of Haynes & Boone LLP on May 7, 2007.[74]  As further reflected in the 2007 investigative protocol, each of these eight volumes had "pasted labels" indicating their relationship to the "DUE DILIGENCE" project conducted by White & Case between March 2001 and April 2002.[75]

26.    Notably, this 2007 investigative protocol was contained within the record of the Russian criminal proceedings against HVY's principals, Mr. Lebedev and Mr. Khodorkovsky.[76] HVY's lawyers thus have been able to access this 2007 investigative protocol through HVY's principal, Mr. Lebedev, who has provided at least four other documents from the same source ("Criminal Investigation File no. 18/432766-07") for HVY's use during the U.S. proceedings

---

[72] Id. at 7.

[73] The documents' chain of custody is explained in the search warrants and investigative protocols.  Initially, the documents were transferred from White & Case to Akin Gump.  See Resolution on Conducting a Search of White & Case, May 17, 2007 (Cotlick Ex. 7-T), ECF No. 2-24, at 4-5 ("OAO NK Yukos submitted some documents to the firm Akin, Gump, Strauss, Hauer & Feld LLP, which documents had been prepared by White & Case regarding the preliminary due diligence . . . .").  Subsequently, these documents were apparently "taken out of 'Akin, Gump, Strauss, Hauer & Feld' LLP and transported to the representative office of the company 'Haynes and Boone International.'  Resolution on Conducting a Search of Haynes & Boone, May 6, 2007 (Ex. RSM-6).  That is where the eight volumes of documents labeled "DOCUMENTS RECEIVED FROM W&C" were seized by Russian investigators.  See Prosecutor General's Office of the Russian Federation, Protocol of Inspection of Documents from Haynes and Boone (May 14, 2007) (describing the May 7, 2007 search of Haynes and Boone's Moscow Office) (Ex. RSM-7).

[74] Prosecutor General's Office of the Russian Federation, Protocol of Inspection of Documents from Haynes and Boone (May 14, 2007) (Ex. RSM-7).

[75] Id.

[76] See Prosecutor General's Office of the Russian Federation, Protocol of Inspection of Documents from Haynes and Boone (May 14, 2007) (Ex. RSM-7).  As reflected on page 20 of RSM-7, this document was included at Page 10 of Volume 144 of Criminal Investigation File no. 18/432766-07.  Similarly, the search warrant related to this search of Haynes & Boone was included at Page 1 of Volume 144 of Criminal Investigation File no. 18/432766-07. Resolution on Conducting a Search of Haynes & Boone, May 6, 2007 (Ex. RSM-6).

under Section 1782 (as explained by Mr. Cotlick).[77]  It seems that HVY's lawyers are therefore well aware of this 2007 investigative protocol's contents, and the fact that these eight volumes of "DOCUMENTS RECEIVED FROM W&C" have been in the Russian Federation's possession continuously since 2007.  Accordingly, if HVY wanted to use any of these requested documents in the proceedings before the Dutch Court of Appeal, HVY had many opportunities during the past four years of the Dutch litigation to request these same documents from the Russian Federation under Article 843a of the DCCP.

27.    For precisely the same reasons, if any part of these "DOCUMENTS RECEIVED FROM W&C" in the Russian Federation's possession are also responsive to Request No. 5, then Request No. 5 must also be considered an effort by HVY to circumvent Article 843a of the DCCP with respect to such documents.

28.    Second, HVY's Requests Nos. 2 and 3 both seek documents that are also understood—by definition—to be in the Russian Federation's possession.  HVY's Request No. 2 seeks documents that White & Case purportedly "disclosed or provided <u>to the Russian Federation</u>," and HVY's Request No. 3 seeks any "[c]ommunications" <u>between White & Case and the Russian Federation</u>.[78]  If the Russian Federation is explicitly defined to be either the recipient or the sender of these categories of documents, then the Russian Federation must be presumed to have these categories of documents in its possession.  HVY never submitted such document requests, however, to either the Dutch District Court or the Dutch Court of Appeal.  Nor does HVY's proposal regarding the future course of proceedings before the Dutch Court of Appeal indicate any intention to seek documents under Article 843a of the DCCP.

29.    For these reasons, HVY's Requests Nos. 1, 2, 3, and 5 must be considered, in whole or in part, attempts by HVY to use Section 1782 to circumvent Dutch law and Dutch legal procedure.

---

[77] Mr. Lebedev has provided at least four documents, including an investigative protocol and a search warrant, from the criminal file to counsel for HVY for use in this proceeding.  *See* Cotlick Decl. ¶¶ 1, 3, 8–9, ECF No. 2-22.

[78] Shepard Decl. Ex. 2 Attach. Doc. Subpoena White & Case at 7–8, ECF No. 2-1.

**B. Four of HVY's Requests (Nos. 2, 3, 4, and 7)[79] Seek Documents that Are Entirely Irrelevant to the Issues in Dispute in The Hague**

30.     Four of HVY's requests (Nos. 2, 3, 4, and 7)[80] have no discernible connection to the Russian Federation's arguments regarding HVY's "unclean hands" or any other issues disputed before the Dutch Court of Appeal.  Any documents produced in response to these requests, therefore, would be disregarded by the Dutch Court of Appeal as irrelevant and immaterial.

31.     First, HVY's Request No. 2 seeks documents "disclosed or provided to the Russian Federation" by White & Case "relating to Petitioners or Yukos, including documents provided in connection with the May 2007 Resolution of Search."[81]  Similarly, HVY's Request No. 3 seeks all of White & Case's alleged "[c]ommunications with Yukos and the Russian Federation relating to the Resolution of Search, relating to the search of White & Case's Moscow office on or about May 2007, or relating to any other transfer of documents to the Russian Federation."[82]

32.     There is no logical nexus between these two categories of documents and the alleged purpose of HVY's petitions under Section 1782.  The Russian Federation's arguments regarding HVY's "unclean hands" are not connected to the Russian investigators' search of White & Case's Moscow office on May 30, 2007.  This event is never mentioned in any of the Russian Federation's pleadings or HVY's pleadings in Dutch litigation.  Moreover, as far as I am aware, the Russian Federation has never relied in support of the "unclean hands" arguments upon any of the documents obtained during that search on May 30, 2007, which were evidently listed in the Russian investigators' corresponding protocol.[83]  Significantly, neither HVY nor its Dutch counsel has identified even a single document that (1) was obtained during that search of White

---

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 8.

[83] *See* Prosecutor General's Office of the Russian Federation, Search Protocol of Documents from White & Case (May 30, 2007) (Cotlick Ex. 8-T), ECF No. 2-26, at 5 (listing the documents obtained during the May 30, 2007 search of White & Case's Moscow Office).

& Case's Moscow office, and (2) has been exhibited or otherwise used by the Russian Federation during the Dutch litigation.

33.    Second, HVY's Request No. 4 seeks "[a]ll Documents in the Identified Clients' Case Files that are Communications with [HVY]," and HVY's Request No. 7 seeks "[a]ll Engagement Letters with the Identified Clients."[84]    These Requests also have no discernible relationship with the illegal privatization of YUKOS in 1995 and 1996, or with the offshore transfers of YUKOS shares to HVY between 1997 and 2001.  HVY's petitions never attempt to explain any logical connection between HVY's Requests Nos. 4 and 7 and the proceedings in The Hague.

34.    Significantly, Mr. Leijten's Declaration never references any of these four document requests at all.  Mr. Leijten does not give any indication as to how the requested documents would be relevant to any issues disputed before the Dutch Court of Appeal. Accordingly, the Dutch Court of Appeal would disregard any documents produced in response to HVY's requests Nos. 2, 3, 4, and 7 as irrelevant and immaterial.

### C.  Three of HVY's Requests (Nos. 1, 5, and 6)[85] Seek Documents that Would Lack Any Probative Value in the Dutch Proceedings

35.    Three of HVY's requests (Nos. 1, 5, and 6)[86] seek documents pertaining to alleged professional advice that White & Case purportedly gave to companies affiliated with HVY in 2001 and 2002 regarding aspects of the YUKOS privatization in 1995-1996.  According to HVY, the purpose of these document requests is to determine whether "the 'external advisors' of Yukos opined" that the Tempo Agreements and other aspects of the YUKOS privatization "made no economic sense."[87]

36.    Such documents, however, would lack any probative value in the Dutch proceedings.  The evidence demonstrates unmistakably that HVY's principals made routine efforts during this same time to deceive their other professional advisors at PWC, Akin Gump, and Clifford Chance regarding each of these topics.  Any legal advice given by White & Case

---

[84] Shepard Decl. Ex. 2 Attach. Doc. Subpoena White & Case at 8, ECF No. 2-1.

[85] *Id.* at 7–8.

[86] *Id.*

[87] HVY Motion for Discovery at 39.

based on false statements or material omissions by HVY's principals would be worthless in the Dutch proceedings.  The legality or illegality of the YUKOS privatization is to be determined, in any event, by the Dutch Court of Appeal itself.

37.     Since 2011, the Russian Federation has emphasized that Mr. Doug Miller, a PWC accountant who worked closely with YUKOS in 2001 and 2002, believed that HVY's principals had deceived him regarding the "true purpose" of the Tempo Agreements.[88]  As Mr. Miller explained, he "could not understand" why the Red Directors had been paid hundreds of millions of U.S. dollars, and promised billions of U.S. dollars more: "I could not understand what work could have been done by them for YUKOS for this huge amount of money; it wasn't logical to me."[89]  In a 2009 deposition in San Diego, for example, Mr. Miller testified under cross-examination that he had "never seen a company compensate management that, for lack of a better term, generously."[90]  Mr. Miller further explained that PWC had withdrawn its audited financial statements for YUKOS in part because Mr. Miller specifically did not believe that "these were payments really for services provided to Yukos."[91]  In Mr. Miller's view, it was more likely that these payments were made because the Red Directors had "help[ed]" HVY's principals to "secure control of Yukos" during the privatization in 1995 and 1996.[92]

38.     Mr. Miller's belief that HVY's principals were deceiving him regarding the Tempo Agreements is corroborated by other documents from the 2002 period.  Most notably, HVY's principals had initially refused to tell their lawyers at Akin Gump where HVY's YUKOS shares had originated.  As one YUKOS executive (Mr. Pavel Malyi) recounted to another YUKOS executive (Mr. Oleg Sheiko) in a 2002 memorandum:

> "**<u>Shareholders</u>**: Akin Gump and Cleary requested from the IFA lawyers (Clifford and Anton Drel) all of the supporting documentation pertaining to the Gibraltar and other structures including how these structures acquired the Company's shares.  So far they have not been satisfied with the answer. P.L. Lebedev's

---

[88] Russian Federation Counter-Memorial ¶¶ 36–39 (Ex. RSM-9).

[89] *Id.* ¶¶ 36–39, n.33 (July 29, 2011).

[90] Miller Dep. at 234–35 In re Application of Mikhail B. Khodorkovsky, No. 09-CV-2185 (S.D. Ca. Dec. 18, 2009) (Ex. RSM-8).

[91] *Id.* at 241.

[92] *Id.*

position, namely: 'I bought the shares on the market from independent parties . . . does not satisfy anyone. The lawyers need to form a picture from the loans-for-shares auctions, Laguna and so forth. Clifford and Drel explain that they cannot solve this problem without P. L. Lebedev, who is currently on vacation.'[93]

39.    In other words, Mr. Lebedev (one of the Oligarchs comprising HVY's principals) was attempting to persuade Akin Gump and the other professional advisors that HVY's parent company in Gibraltar (Group Menatep Ltd.) had obtained ownership and control of HVY's YUKOS shares "from independent parties."[94]    As HVY's principals would later admit internally (but never disclosed to the public until many years later), this was a falsehood. In fact, HVY did not obtain their YUKOS shares "from independent parties,"[95] but rather from the shell companies, "Laguna" and "Monblan," which were both "affiliate[s] of companies jointly controlled by the current shareholders" of HVY.[96]

40.    HVY's principals had told a similar falsehood to Clifford Chance. As reflected in an undated memorandum, HVY's principals had informed their lawyers at Clifford Chance that "in the period from 1996 to 2000" the majority ownership interest in YUKOS shares had "circulated actively on the secondary securities market."[97]    In fact, as Mr. Anilionis explained during his interview with Russian investigators, this also was not true.[98] Throughout this period, the majority ownership of YUKOS shares had been held continuously by HVY's principals, regardless of which offshore shell companies in Cyprus, the Isle of Man, or elsewhere had been used to disguise this continuous ownership.[99]

41.    Under such circumstances, where HVY's principals had consistently deceived their professional advisors at PWC, Akin Gump, and Clifford Chance, it would make no sense for the Dutch Court of Appeal to rely upon White & Case's professional advice as evidence of

---

[93] Memo from Pavel N. Malyi to Oleg V. Sheiko (July 30, 2002) (Ex. RSM-3).

[94] *Id.*

[95] *Id.*

[96] Draft F-1 Registration Statement (Mar. 19, 2003) (Ex. RSM-4).

[97] Clifford Chance Memo No. 1-90646-06 (Ex. RSM-1).

[98] *See* Prosecutor General's Office of the Russian Federation, Protocol of Witness Interview with Gitas Pavilo Anilionis (Jan. 18, 2007) (Ex. RSM-5).

[99] *See id.*

the legality or illegality of the YUKOS privatization and subsequent transactions. Any professional legal advice is of no value when it is premised on false statements of fact or material omissions. In evaluating the legality or illegality of the YUKOS privatization, therefore, the Dutch Court of Appeal would give no probative weight to such legal advice.

42. Even more fundamentally, all of this professional advice is merely a peripheral distraction. The core of this matter does not hinge on professional advice at all, whether such professional advice was delivered based on accurate or inaccurate information. To the contrary, the core of this matter is the following question—what were the true economic justifications for the conduct of the Oligarchs comprising HVY's principals during the YUKOS privatization? Irrespective of what their lawyers and accountants may have said at various times, HVY's principals should be able to answer this question. The Oligarchs comprising HVY's principals were sophisticated parties, and indeed were among the most successful business tycoons in the Russian Federation. They were not so-called "widows and orphans," who are unable to explain the economic justifications of their actions without assistance. Notably, Mr. Platon Lebedev himself has been assisting HVY in preparing its evidence for this proceeding, as Mr. Cotlick confirms.[100] Unlike any of the professional advisors retained for brief periods over the years, Mr. Lebedev, was an actual participant in the original YUKOS privatization during 1995 and 1996. As compared to any of his former accountants or attorneys, Mr. Lebedev is far better situated to explain the true economic justifications for these transactions. Remarkably, however, HVY has never proffered Mr. Lebedev—or any other person with first-hand knowledge of the Tempo Agreements—as a witness.

43. In my view as a Dutch lawyer, therefore, the Dutch Court of Appeal would not place any weight on professional advice offered under such circumstances. This is particularly so where HVY's principals routinely deceived their lawyers, and have themselves refused to provide testimony regarding their own transactions. Any documents responsive to HVY's Requests Nos. 1, 5, and 6 would therefore be lacking in any probative value.

---

[100] Cotlick Decl. ¶¶ 1, 3, 8–9, ECF No. 2-22.

### D. Dutch Law Prohibits the Compelled Cross-Examination of Lawyers Regarding Communications with Their Client

44.    Finally, in these proceedings, HVY seek the cross-examination of two attorneys regarding work they performed for the former clients of White & Case.  In the Netherlands, attorneys are barred from disclosing information that is entrusted to them by their clients.  Both the Dutch Code of Civil Procedure (Article 165(2)(b)) and the Dutch Code of Criminal Procedure (Article 218) recognize this professional privilege: an attorney cannot, in principle, be obligated to testify in violation of the professional duty of confidentiality vis-à-vis his clients. The Dutch courts thus would respect the privilege and confidentiality protections applicable to foreign lawyers under foreign law.

45.    The common criterion between the civil law and criminal law provisions, according to longstanding and continuous decisions of the Supreme Court of the Netherlands, is that protected information includes "everything that has been entrusted to the attorney in his capacity as attorney."  The privilege derives from the attorney's duty of confidentiality, which is set forth in Rule 3 of the Netherlands Bar Association's Code of Conduct. More recently, the duty of confidentiality also has been codified under Articles 10 and 10a(1), sub (e) of the Attorneys Act (*Advocatenwet*).  Moreover, there is an abundance of civil and criminal case law of the Dutch Supreme Court upholding the professional privilege and duty of confidentiality for attorneys.  Willful violation of the professional duty of confidentiality is a crime (under Article 272 of the Criminal Code) punishable with imprisonment for one year or a fine of € 20,500.

*        *        *

46.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 29, 2018                          Respectfully submitted,

_____
Rob S. Meijer
Houthoff
Gustav Mahlerplein 50
Amsterdam 1082 MA
The Netherlands
T. +31206056108
r.meijer@houthoff.com

**DECLARATION OF ROB S. MEIJER: INDEX OF EXHIBITS**
**October 29, 2018**

| DOCUMENT | DATE | EX. NO. |
|---|---|---|
| Clifford Chance Memorandum No. 1-90646-06 | - | RSM-1 |
| Bank Statements of Yukos Universal Ltd. | 2001 - 2003 | RSM-2 |
| Memorandum from Pavel N. Malyi to Oleg V. Sheiko | 30 July 2002 | RSM-3 |
| Draft F-1 Registration Statement | 19 Mar. 2003 | RSM-4 |
| Prosecutor General's Office of the Russian Federation, Interrogation Protocol of Gitas Pavilo Anilionis | 18 Jan. 2007 | RSM-5 |
| Prosecutor General's Office of the Russian Federation, Search Warrant for Haynes and Boone | 06 May 2007 | RSM-6 |
| Prosecutor General's Office of the Russian Federation, Protocol of Inspection of Documents from Haynes and Boone | 14 May 2007 | RSM-7 |
| *In re Application of Mikhail B. Khodorkovsky*, No. 09-CV-2185 (S.D. Cal. Dec. 18, 2009), Deposition of Douglas Miller | 18 Dec. 2009 | RSM-8 |
| *Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. v. The Russian Federation*, PCA Case Nos. 226, 227, 228, Respondent's Counter-Memorial | 29 July 2011 | RSM-9 |
| *Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. v. The Russian Federation*, PCA Case Nos. 226, 227, 228, Respondent's Rejoinder on the Merits | 16 Aug. 2012 | RSM-10 |
| *Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. v. The Russian Federation*, PCA Case Nos. 226, 227, 228, Russian Federation's Skeleton Argument | 01 Oct. 2012 | RSM-11 |
| *Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. v. The Russian Federation*, PCA Case Nos. 226, 227, 228, Hearing on the Merits, Transcript of Day 19 | 06 Nov. 2012 | RSM-12 |
| *Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. v. The Russian Federation*, PCA Case Nos. 226, 227, 228, Respondent's Post-Hearing Brief | 21 Dec. 2012 | RSM-13 |
| Tim Osborne, *Yukos and Russia: A Response to The Global Lawyer*, THE AMERICAN LAWYER | 05 Aug. 2016 | RSM-14 |
| Record of Appearance Before the Court of the Parties | 16 Jan. 2017 | RSM-15 |
| Court of Appeal in The Hague, Interim Judgment, Case No. 200.079_01 (*HVY v. The Russian Federation*) | 25 Sept. 2018 | RSM-16 |
| Submission Containing a Proposal for the Further Course of the Proceedings on the Part of HVY | 16 Oct. 2018 | RSM-17 |

| DOCUMENT | DATE | EX. NO. |
|---|---|---|
| Submission Containing a Proposal for the Further Course of the Proceedings | 23 Oct. 2018 | RSM-18 |
| CV of Rob S. Meijer | 29 Oct. 2018 | RSM-19 |