UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                              :
                                                              :
IN RE: APPLICATION OF
HULLEY ENTERPRISES, LTD.,                                     :
YUKOS UNIVERSAL LTD., and
VETERAN PETROLEUM LTD., FOR AN                                :
ORDER PURSUANT TO 28 U.S.C. § 1782                                      OPINION AND ORDER
TO CONDUCT DISCOVERY FOR USE IN A                            :
FOREIGN PROCEEDING
                                                              :
                                                                        18-MC-435 (GWG)
                                                              :

                                                              :
-----------------------------------------------------------------x

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

        Petitioners Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd.

have applied pursuant to 28 U.S.C. § 1782 for leave to serve subpoenas on respondents White &

Case, LLP, and on White & Case, LLP's Chairman Hugh Verrier.  The subpoenas seek evidence

in connection with litigation currently pending in the Court of Appeal of the Hague (the "Dutch

Appellate Court").  The application has been fully briefed.[1]  For the following reasons, the Court

_____

        [1] Ex Parte Application by Hulley Enterprises, Ltd., Yukos Universal Ltd., and Veteran
Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a
Foreign Proceeding and Statement in Support Thereof, filed Sept. 17, 2018 (Docket # 1) ("Ex
Parte Application"); Memorandum of Law in Support of Ex Parte Application by Hulley
Enterprises, Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28
U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, filed Sept. 17, 2018
(Docket # 2) ("Pet. Mem."); Declaration of Steven Shepard (annexed as Ex. A to Pet. Mem.)
("Shepard Decl."); Declaration of Marnix Leijten in Support of Hulley Enterprises Ltd., Yukos
Universal Ltd., and Veteran Petroleum Ltd.'s Application for an Order Pursuant to 28 U.S.C.
§ 1782 to Conduct Discovery for Use in a Foreign Proceeding (annexed as Ex. B to Pet. Mem)
("Leijten Decl."); Declaration of Michael Cotlick (annexed as Ex. D to Pet. Mem.) ("Cotlick
Decl.); [Proposed] Order Granting Ex Parte Application by Hulley Enterprises, Ltd., Yukos
Universal Ltd., and Veteran Petroleum Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to
Conduct Discovery for Use in a Foreign Proceeding, filed Sept. 17, 2018 (Docket # 3); First
Amended Application by Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum
Ltd. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign

denies petitioners' application.

I. BACKGROUND

    A. The Arbitrations and Litigation in the Hague

    Petitioners are former shareholders of OAO Yukos Oil Company ("Yukos"), a Russian

oil and gas company that was privatized in the mid-1990s. See Pet. Mem. at 1; Resp. Opp. at 5.

As of 2003, the petitioners together held an approximately 70% interest in Yukos. Pet. Mem. at

1. Starting in approximately 1998, White & Case represented Yukos and its subsidiaries.

Declaration of David Godfrey (annexed as Ex. C to Pet. Mem.) ("Godfrey Decl."), ¶¶ 3-4; Resp.

Opp. at 5. That representation continued through approximately 2003 or 2004. Godfrey Decl.

¶ 4; Resp. Opp. at 5; Pet. Mem. at 3. Petitioners assert that during its representation, White &

---

Proceeding and Statement in Support Thereof, filed Sept. 20, 2018 (Docket # 7); Notice of Filing of Exhibit 17-1 to the Rachkov Declaration, filed Oct. 3, 2018 (Docket # 16); Memorandum of Law in Opposition to Petitioners' Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, filed Oct. 30, 2018 (Docket # 19) ("Resp. Opp."); Declaration of Jennifer Paradise, filed Oct. 30, 2018 (Docket # 20) ("Paradise Decl."); Declaration of Hugh Verrier, filed Oct. 30, 2018 (Docket # 21) ("Verrier Decl."); Declaration of Rob S. Meijer, filed Oct. 30, 2018 (Docket # 22) ("Meijer Decl."); Declaration of Dwight A. Healy, filed Oct. 30, 2018 (Docket # 23) ("Healy Decl."); Declaration of Professor Mikhail Zinovyevich Schwarts (certified translation from Russian), filed Oct. 30, 2018 (Docket # 24) ("Schwarts Decl."); Petitioners' Reply Memorandum of Law in Support of Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, filed Nov. 13, 2018 (Docket # 30) ("Pet. Reply"); Second Declaration of Marnix Leijten in Support of Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd.'s Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding, filed Nov. 13, 2018 (Docket # 31); Second Declaration of Michael Cotlick, filed Nov. 14, 2018 (Docket # 34) ("Second Cotlick Decl."); Second Declaration of Dr. Ilia V. Rachkov, filed Nov. 14, 2018 (Docket # 35) (duplicate filing of Docket # 33) ("Second Rachkov Decl."); Certification of Accuracy by Elena Kolesnikova, filed Nov. 15, 2018 (Docket # 36); Respondents' Sur-Reply on Petitioners' § 1782 Application, filed Nov. 26, 2018 (Docket # 40) ("Resp. Sur-Reply"); Second Declaration of Jennifer Paradise, filed Nov. 26, 2018 (Docket # 41) ("Second Paradise Decl."); Letter from Steven M. Shepard, filed Nov. 28, 2018 (Docket # 42) ("Shepard Letter"); Third Declaration of Michael Cotlick, dated Nov. 28, 2018 (annexed as Ex. A to Shepard Letter); Petitioner's Notice of Supplemental Authority, filed Jan. 2, 2019 (Docket # 44) ("Pet. Not. Supp. Authority"); Letter from Richard J. Holwell, filed Jan. 4, 2019 (Docket # 45) ("Holwell Letter"); Letter from Steven M. Shepard, filed Jan. 25, 2019 (Docket # 46); Letter from Richard J. Holwell, filed Jan. 29, 2019 (Docket # 47).

Case conducted a "full due diligence review of [Yukos] and its subsidiaries," Pet. Mem. at 4 (quoting Godfrey Decl. ¶ 7); that White & Case "provided 'extensive due diligence and other services'" to subsidiary Menatep Limited, which involved investigating and authenticating the title to Yukos' shares, id. at 5-6 (quoting Godfrey Decl. ¶ 8); and that White & Case provided other services (including giving advice) to Yukos and related entities, Pet. Mem. at 4-7.

In proceedings in Holland, petitioners have alleged that, beginning in 2003, the Russian Federation unlawfully expropriated their investments in Yukos. See Pet. Mem. at 7-8; Resp. Opp. at 5-6. To effectuate this expropriation, the petitioners allege that the Russian Federation "claimed that Yukos owed back taxes of approximately $27 billion; froze Yukos's bank accounts; seized Yukos's assets; forced the company into bankruptcy; and transferred its assets to Russian state-owned oil and gas companies Rosneft and Gazprom." Pet. Mem. at 7. According to petitioners, as of November 2007, Yukos no longer existed as a legal entity. Pet. Mem. at 8.

In February 2005, petitioners commenced arbitrations in the Hague against the Russian Federation, seeking compensation for the alleged expropriation under the Energy Charter Treaty. See Final Award, In the Matter of an Arbitration Before a Tribunal Constituted in Accordance with Article 26 of the Energy Charter Treaty and the 1976 UNCITRAL Arbitration Rules, Between Hulley Enterprises Limited (Cyprus) and the Russian Federation, July 18, 2014 (annexed as Ex. 2a to Leijten Decl.) ("Final Arbitration Award"), ¶¶ 10-11; see also Meijer Decl. ¶ 9.

In 2007, Russian prosecutors requested documents from White & Case relating, inter alia, to the petitioners' acquisition of shares in Yukos. Pet. Mem. at 9; see Resolution on Conducting a Search (certified translation from Russian), dated May 16, 2007 (annexed as Ex. 7-

T to Cotlick Decl.) ("Search Resolution"). White & Case supplied these documents to Russia. Declaration of Dr. Ilia V. Rachkov in Support of Hulley Enterprises Ltd., Yukos Universal Ltd., and Veteran Petroleum Ltd.'s Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding (annexed as Ex. E to Pet. Mem.) ("Rachkov Decl."), ¶ 31. These documents later found their way into a Russian criminal investigative file, which petitioners refer to as the "mother file." Pet. Reply at 1; see also Second Cotlick Decl. ¶¶ 26-37. Documents in the "mother file" are being used by Russia to challenge arbitration awards in judicial proceedings in the United States, United Kingdom, and Germany. See id. ¶¶ 29-33. Petitioners have not been given access to any documents contained in the "mother file." Id. ¶¶ 38-42. White & Case now represents Russia in proceedings relating to petitioner's claims against Russia arising from Yukos, though not in the proceeding pending in the Dutch Appellate Court. See id. ¶ 27; Meijer Decl.¶ 9. Petitioners allege that White & Case therefore now has access to the "mother file," including its "due diligence" documents from 2002. Second Cotlick Decl. ¶ 27.

In July 2014, the Hague Arbitral Tribunal (the "Tribunal") found that while the Russian Federation "ha[d] not explicitly expropriated Yukos or the holdings of its shareholders . . . the measures that [the Russian Federation] has taken in respect of Yukos . . . have had an effect equivalent to nationalization or expropriation." Final Arbitration Award ¶ 1580 (internal quotation marks omitted). Accordingly, the Tribunal concluded that the Russian Federation had breached its obligations under Article 13 of the Energy Charter Treaty, id. ¶ 1585, and ordered the Russian Federation to pay over $50 billion in damages to petitioners, see id. ¶ 1888 (award to petitioner Hulley); Final Award, in the Matter of an Arbitration Before a Tribunal Constituted in Accordance with Article 26 of the Energy Charter Treaty and the 1976 UNCITRAL Arbitration

4

Rules, Between Yukos Universal Limited (Isle of Man) and the Russian Federation, dated July 18, 2014 (annexed as Ex. 2b to Leijten Decl.), ¶ 1888(f) (award to petitioner Yukos Universal Ltd.); Final Award, in the Matter of an Arbitration Before a Tribunal Constituted in Accordance with Article 26 of the Energy Charter Treaty and the 1976 UNCITRAL Arbitration Rules, Between Veteran Petroleum Limited (Cyprus) and the Russian Federation (annexed as Ex. 2c to Leijten Decl.), ¶ 1888(f) (award to petitioner Veteran Petroleum Limited); see also Meijer Decl., ¶ 3.

Several months after the Tribunal's decision, in November 2014, the Russian Federation sought to have the judgment set aside by filing an action in Dutch district court. Leijten Decl. ¶ 7; Meijer Decl. ¶ 15. On April 20, 2016, the Dutch district court set aside the awards, holding that the Russian Federation was not bound by the Energy Charter Treaty, and accordingly that the Tribunal lacked jurisdiction over the Russian Federation. See Leijten Decl. ¶ 8; Meijer Decl. ¶ 19; see also "Dutch District Court Judgment," dated Apr. 20, 2016, Unofficial Translation (annexed as Ex. 3 to Leijten Decl.) ("Dutch District Court Judgment"). In July 2016, the petitioners appealed the district court's judgment in the Dutch Appellate Court. Leijten Decl. ¶ 9; Meijer Decl. ¶ 19. That appeal is still pending.

B. The Instant Application

Petitioners filed the instant application pursuant to 28 U.S.C. § 1782 on September 17, 2018, seeking evidence to refute allegations by the Russian Federation that petitioners have "unclean hands" because of the manner in which Yukos was privatized in the mid-1990s, and the way in which petitioners acquired their Yukos shares. In this application, petitioners seek discovery under section 1782 from White & Case relating to its representation of Yukos and related entities between 1998 and 2004.

In particular, petitioners state that they seek documents from the case files of Yukos and seven other "Identified Clients": Menatep Limited, MFO Menatep, Eastern Oil Company ("VNK"), OAO Tomskneft, Chemical & Mining Universal Limited, Pecunia Limited, and Veteran Petroleum Trust. Attachment to Document Subpoena to White & Case (annexed as part of Ex. 2 to Shepard Decl.) ("Attachment to Proposed White & Case Document Subpoena"), 3, 7-8. The term "Identified Clients" also includes petitioners and "GML Limited (formerly known as Group Menatep Limited)." Id. at 3. White & Case, however, states that it has no record of having represented petitioners and certain other "Identified Clients." Paradise Decl. ¶ 2.[2]

Petitioners' request seeks documents, inter alia, relating to what it terms the "Yukos Shares Due Diligence Project," see Attachment to Proposed White & Case Document Subpoena at 7, and any other documents contained in the "case files" of Yukos and the other specified entities "that relate to any investigation of the 'title' to Yukos Shares," or which "relate to the Tempo Agreements," id. at 8. As explained further in section VI.D below, the "Tempo Agreements" are alleged by Russia to have been a vehicles used by petitioners to pay bribes in connection with their acquisition of the Yukos shares.

Petitioners seek to use these documents to refute the Russian Federation's allegations that at the time Yukos entered into the so-called "Tempo Agreements," Yukos' "external

---

[2] In his Declaration, David Godfrey, a former senior associate at White & Case, states that "White & Case provided legal services to Yukos and [Group Menatep Limited]'s subsidiaries Menatep Limited and MFO Menatep during the period 1998-2004." Godfrey Decl. ¶ 4. Godfrey asserts that he has "personal knowledge of the services that White & Case provided to Yukos and GML's subsidiaries, both before and after [his] departure from White & Case [in April 2002]." Id. ¶¶ 4-5. However, General Counsel for White & Case, Jennifer Paradise, states that while "[a] number of [the] entities" for which petitioners requested "case files" "are indeed former clients of White & Case," White & Case has "no record of having represented the others," and has no record of having ever represented any of the petitioners or Group Menatep Limited. Paradise Decl. ¶ 2.

advisors" opined that the agreements "made no economic sense." Pet. Mem. at 32 (citing

Leijten Decl. ¶¶ 23-24). Petitioners expect that the information contained in White & Case's due

diligence files will "show[] that the Yukos privatization, related transactions, and subsequent

transfers of shares, were lawful." Id. at 2.

Petitioners also seek to serve subpoenas to take a deposition of White & Case under Fed.

R. Civ. P. 30(b)(6), see Subpoena to Testify at a Deposition in a Civil Action: White & Case

LLP (annexed as Ex. 3 to Shepard Decl.) ("Proposed 30(b)(6) Subpoena"), and to take the

deposition of Hugh Verrier, see Subpoena to Testify at a Deposition in a Civil Action: Hugh

Verrier (annexed as Ex. 4 to Shepard Decl.) ("Proposed Verrier Subpoena"), who was the head

of White & Case's Moscow office between 1998 and 2007, Verrier Decl. ¶ 2, and was the

assigned billing partner on the Yukos and related matters, Godfrey ¶ 5; Verrier Decl. ¶ 3.

The parties agree that the bulk of the responsive documents being sought, if they exist,

are likely located in White & Case's overseas offices, "most particularly in its Moscow office."

See Pet. Mem. at 19; Resp. Opp. at 9; see also Paradise Decl. ¶¶ 8-10. White & Case has already

conducted a preliminary search for responsive documents in the United States. See id. ¶¶ 4-7.

White & Case General Counsel Jennifer Paradise affirms that the firm has "identified a handful

of boxes in the United States containing hard-copy White & Case documents related to

engagements for the Identified Clients." Id. ¶ 5. The firm "also identified some electronic

documents on the firm's document-management system in the United States" related to these

clients. Id. However, Ms. Paradise affirms that none of the reviewed documents "relate to the

Yukos due diligence matter described by Petitioners; involve any due diligence of the

privatization of Yukos, the transfer of Yukos shares or the validity or legality of the acquisition

of title to such shares; relate to Tempo Finance," or are otherwise responsive to petitioners'

request.  Id.  Ms. Paradise also affirms that records for the Identified Clients exist on White &

Case's United States billing and conflict-checks systems, but she asserts that "[t]o the extent

these are deemed responsive, many of these records are confidential and I understand them to be

protected by both U.S. privilege and professional conduct rules as well as Russian-law

confidentiality restrictions."  Id. ¶ 6.  In addition, Ms. Paradise affirms that most of White &

Case's emails from the relevant time period are archived and would need to be restored, and that

she "believe[s] it unlikely that any responsive emails would be found on U.S. mailboxes . . .

because none of the White & Case engagements by the Identified Clients were run out of U.S.

offices of the firm."  Id. ¶ 7.

Ms. Paradise also affirms that "there are several boxes outside the United States which

are labeled as relating to White & Case engagements for the Identified Clients . . . located in

Europe and Russia," id. ¶ 8, as well as "some electronic documents . . . on servers located

abroad," id. ¶ 9.  Emails from the relevant time period are similarly archived, and Ms. Paradise

affirms that the archived emails, "to the extent not corrupted, would need to be restored," which

"would be a time-intensive, burdensome, and potentially very disruptive and costly process."  Id.

¶ 10.

With respect to the discovery sought regarding the Tempo Agreements, Ms. Paradise

affirms that "White & Case's attorneys reviewed the billing records for all client engagements

between White & Case and the Identified Clients," and that she was informed that "there are no

client matters for or referencing Tempo Finance and that the billing records do not reflect work

performed with respect to Tempo Finance or with respect to any agreement involving Tempo

Finance."  Id. ¶ 11.

It is clear that petitioners are seeking at least some discovery from White & Case because

petitioners believe White & Case has access to documents contained in the Russian Federation's "mother file" as a result of White & Case's current representation of the Russian Federation in proceedings in the United States, United Kingdom, and Germany, challenging arbitration awards. <u>See</u> Second Cotlick Decl. ¶¶ 26-37. In May 2007, the Russian Federation executed a "Resolution of Search" of White & Case's Moscow office, seeking documents "concerning the preliminary due diligence of the issues relating to the purchase of . . . Yukos shares by the beneficiary owners . . . during the privatization and subsequent transfer of the said shares submitted by . . . Yukos, Group Menatep Limited and other persons in the course of the due diligence process," and other related documents. <u>See</u> Search Resolution. However, the Resolution of Search noted that "Yukos submitted some [of the due diligence] documents to the firm Akin, Gump, Strauss, Hauer & Feld, LLP." <u>Id.</u>; <u>see also</u> Paradise Decl. ¶ 12 ("in or about May 2002 . . . materials in White & Case files relating to [the Yukos Due Diligence Project] were collected . . . and provided to replacement counsel for Yukos" after Yukos terminated White & Case's representation). The documents were subsequently transferred from Akin Gump to the offices of Haynes & Boone, and eight "volumes" (about 1600 pages) of these materials were ultimately seized by the Russian Federation from Haynes & Boone's offices. <u>See</u> Meijer Decl. ¶ 25 & n.73. Petitioners assert that White & Case lawyers in the United States, engaged by the Russian Federation in proceedings to prevent enforcement of Arbitral Awards awarded by tribunals other than the Dutch Tribunal, "have full access" to these and other records located in Russia's "mother file" and should be made to turn over responsive documents contained therein. <u>See</u> Second Coltick Decl. ¶¶ 26-37. Petitioners assert that they are not seeking "documents or information <u>generated</u> during White & Case's current representation of the Russian Federation." Pet. Mem. at 16 (emphasis added). Rather, they are seeking "historical

9

documents" — that is, "documents received or generated by White & Case between 1998 and 2004." Id. at 16 n.9.  Petitioners state that if the documents sought "were once possessed by White & Case, were seized by the Russian Federation, and then were returned to the firm by the Russian Federation, then Petitioners will seek production of those historical documents even if they were returned to the firm in connection with its current representation of the Russian Federation." Id.

Petitioners argue that these documents are not privileged because Yukos no longer exists under Russian law, White & Case waived any privilege over the documents when it provided them to the Russian Federation, and that one of the "Identified Clients," Menatep Limited, has requested that White & Case produce its case file. Id. at 20-28.  Petitioners assert that "[t]he Russian Federation's act of transmitting a document to White & Case in connection with the post-arbitral enforcement proceedings does not make that document now privileged." Id. at 36 n.16 (citing Fisher v. United States, 425 U.S. 391, 404 (1976)).  In making its argument against recognizing any type of privilege over these documents, petitioners argue that it would be "perverse" to allow White & Case to invoke privilege because "White & Case would be making use of the privilege once owed to a former, now-slain client (Yukos) in order for the firm to better assist that client's slayer (the Russian Federation) to escape from the justice sought by Yukos' former majority shareholders." Id. at 22.

For its part, White & Case argues that "[t]o the extent that Petitioners suggest that White & Case in its capacity as counsel for the Russian Federation is using White & Case client files relating to Yukos and /or its affiliated entities, Petitioners are sorely mistaken." Resp. Sur-Reply at 4 n.2.  White & Case asserts that when it "undertook the Russian Federation representation it established a screen that prevents personnel working on that representation from accessing

information of its former clients relating to Yukos and its affiliates." Id. (citing Second Paradise Decl. ¶ 2).

## II.  LAW GOVERNING REQUESTS UNDER 28 U.S.C. § 1782

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004).  The statute provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).  Under the statute, however, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." Id.

The "twin aims" of section 1782 are "providing efficient means of assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." Intel, 542 U.S. at 252; accord In re Accent Delight Int'l Ltd., 869 F.3d 121, 134 (2d Cir. 2017); Application of Malev Hungarian Airlines, 964 F.2d 97, 100 (2d Cir. 1992).

For a district court to have jurisdiction to grant a section 1782 petition, three

requirements must be met: 1) "the person from whom discovery is sought [must] reside[s] (or [be] found) in the district of the district court to which the application is made;" 2) "the discovery [must be] for use in a proceeding before a foreign tribunal;" and 3) "the application [must be] made by a foreign or international tribunal or any interested person." Kiobel by Samkalden v. Cravath, Swaine & Moore LLP, 895 F.3d 238, 243 (2d Cir. 2018) (citing In re Esses, 101 F.3d 873, 875 (2d Cir. 1996) (per curium)) (some alterations added). "Once a district court is assured that it has jurisdiction over the petition, it 'may grant discovery under § 1782 in its discretion.'" Id. at 244 (citing Mees v. Buiter, 793 F.3d 291, 297 (2d Cir. 2015)). "To guide district courts in the decision to grant a Section 1782 petition, the Supreme Court in Intel, 542 U.S. 241 . . . discussed non-exclusive factors (the 'Intel factors') to be considered in light of the 'twin aims' of Section 1782." Id. The four Intel factors are:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and
> (4) whether the request is "unduly intrusive or burdensome."

Id. (quoting Intel, 542 U.S. at 264-65). However, "[t]he Intel factors are not to be applied mechanically," and "[a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute." Id. at 245 (citing Intel, 542 U.S. at 264-65).

III.  THE COURT'S AUTHORITY UNDER FED. R. CIV. P. 72

The Court first addresses statements made by the parties regarding whether this Court has authority to decide petitioners' request for discovery under section 1782 by means of an Opinion

and Order.  In a letter to the Court, the parties suggest that the application for relief in this case is a "dispositive motion" under Fed. R. Civ. P. 72(b) and thus must be decided by means of a Report and Recommendation.  See Joint Letter, dated Dec. 6, 2018 (Docket # 43).  We disagree.

The parties correctly point out that, where assistance under section 1782 is sought in a separate proceeding, "the issuance of [a section 1782] order concludes all proceedings before the issuing district court," Vera v. Republic of Cuba, 802 F.3d 242, 247 (2d Cir. 2015) (citing Chevron Corp. v. Berlinger, 629 F.3d 297, 306 (2d Cir. 2011)), and that "[o]rders granting (or denying) applications for discovery under Section 1782 are considered final adjudications and are immediately appealable," In re Accent Delight Int'l Ltd., 869 F.3d 121, 128 (2d Cir. 2017). The parties, however, incorrectly assume that the fact that an order is "immediately appealable" or "final" within the meaning of  28 U.S.C. § 1291 has some bearing on the application of Fed. R. Civ. P. 72(b).  In fact, these are not relevant considerations.

As the Advisory Committee notes (1983 Addition) make clear, Rule 72(b) is merely a rule that governs the procedure for making objections to court-ordered referrals of the matters contained in "28 U.S.C. § 636(b)(1)(B)," which the Rule refers to under the rubric of "dispositive" matters.  See Fed. R. Civ. P. 72(b) advisory committee's note to 1983 addition.  28 U.S.C. § 636(b)(1)(B) in turn limits its provision to those matters "excepted" by 28 U.S.C. § 636(b)(1)(A), which are

> a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

Thus, the term "dispositive matters" in Rule 72(b) is intended to capture the matters excepted in 28 U.S.C. § 636(b)(1)(A).  None of these excepted matters, however, equate to a discovery

request in a proceeding under section 1782. And there is no suggestion in either the text of Rule 72(b) or the Advisory Committee notes that Rule 72(b) was intended to expand the scope of Congress's explication of this category. See generally Kiobel v. Millson, 592 F.3d 78, 84 (2d Cir. 2010) ("Excluded from [the] grant of authority [to adjudicate pretrial matters] are dispositive motions, such as motions 'for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information . . . , to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim . . . , and to involuntarily dismiss an action'") (citing 28 U.S.C. § 636(b)(1)(A)).

Thus, a motion seeking discovery as an aid to a later adjudication by a court or tribunal is not a "dispositive" motion within the meaning of Rule 72 — even if it is brought in a special proceeding whose only purpose is to obtain that discovery. See, e.g., In re Application of Ilyas Khrapunov, 2018 WL 3239001, at *4 n.3 (N.D. Cal. July 3, 2018) ("courts in this circuit have found magistrate judge orders non-dispositive in analogous circumstances: where the order disposed of the sole matter in federal court, but did not dispose of the petitioner's 'underlying claims or defenses' in the foreign tribunal"); see generally In re Application of the Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C. § 1782(a), 735 F.3d 1179, 1182 (10th Cir. 2013) (holding, in a section 1782 proceeding, that "there is nothing to be done 'on the merits'" because "[t]he only issue before the district court is discovery"). A helpful analogy is found in cases where a proceeding is commenced in a district court under Fed. R. Civ. P. 45 to quash a subpoena issued by another district court. Such matters are routinely decided by Magistrate Judges as "non-dispositive" matters even though the ruling completely "disposes" of the special proceeding before the district court (that is, the application to quash or enforce the subpoena for use in the out-of-district proceeding). See, e.g., Agincourt Gaming, LLC v. Zynga,

Inc., 2014 WL 4079555, at *2 (D. Nev. Aug. 15, 2014) ("That subpoena-related motions come before the court in the context of a miscellaneous action based entirely on the disputed subpoenas does not alter [the] conclusion [that it is non-dispositive], even though the magistrate judge's resolution of the motions may be dispositive of the miscellaneous action."); Feist v. RCN Corp., 2012 WL 4835038, at *1 (N.D. Cal. Oct. 4, 2012) (magistrate judge's order on motion to quash was non-dispositive because "although resolution of the motions to quash will resolve all the issues in this Court, resolution of the motions to quash will not resolve all of the proceedings in federal court"); Verso Paper, LLC v. HireRight, Inc., 2012 WL 2376046, at *4 (S.D. Miss. June 22, 2012) (motion to quash out-of-district subpoena is non-dispositive because "[t]his matter is essentially a discovery dispute, which is considered nondispositive of the claims in the original litigation"); see also Cognate BioServices, Inc. v. Smith, 2015 WL 1256499, at *6 n.19 (D. Md. Mar. 17, 2015) ("closing a case that commenced on a motion to compel is not a dispositive ruling").

In deciding this application by means of an Opinion and Order, we follow the many courts from across the country that have held that an application brought under 28 U.S.C. § 1782 is a "non-dispositive" matter within the meaning of Fed. R. Civ. P. 72(b).  See JSC MCC EuroChem v. Chauhan, 2018 WL 3872197, at *1 (M.D. Tenn. Aug. 15, 2018) (citing cases); In re Pola Mar. Ltd. for order pursuant to 28 U.S.C. §1782 to conduct discovery for use in foreign proceedings, 2018 WL 1787181, at *1 (S.D. Ga. Apr. 13, 2018); Application Pursuant to 28 U.S.C. § 1792 by Nikon Corp. v. GlobalFoundries U.S., Inc., 2017 WL 4647753, at *3 (N.D. Cal. Oct. 16, 2017); Matter of a Petition for Judicial Assistance Pursuant to 28 U.S.C. § 1782 by Macquarie Bank Ltd., 2015 WL 7258483, at *3 (D. Nev. Nov. 17, 2015);  In re Sergeeva, 2015 WL 12866970, at *1-2 (N.D. Ga. Feb. 6, 2015); Siemens AG v. W. Dig. Corp., 2014 WL

15

1569605, at *2 (C.D. Cal. Apr. 17, 2014); In re Application of Consellior SAS, 2014 WL

111110, at *3 (D. Conn. Jan. 10, 2014); Republic of Ecuador v. Bjorkman, 2011 WL 5439681, at

*1 (D. Colo. Nov. 9, 2011); Weber v. Finker, 2008 WL 2157034, at *1 (M.D. Fla. May 20,

2008) aff'd, 554 F.3d 1379 (11th Cir. 2009); In re Oxus Gold PLC, 2007 WL 1037387, at *2

(D.N.J. Apr. 2, 2007); In re Duizendstraal,1997 WL 195443, at *1 (N.D. Tex. Apr. 16, 1997).

Obviously, the parties retain their right to file objections to this Opinion and Order under Fed. R.

Civ. P. 72(a).[3]

## IV. STATUTORY REQUIREMENTS

The Court finds that the three statutory requirements of section 1782 are met.

Respondents do not contest this. See Resp. Opp. at 19. Both White & Case and Mr. Verrier are

found in the Southern District of New York. The evidence being sought through this

section 1782 request is "for use" in proceedings before the Dutch Appellate Court, which

qualifies as a "proceeding in a foreign . . . tribunal." Intel, 542 U.S. at 257-58; see also In re

Application of Elvis Presley Enters. LLC for an Order to Take Discovery Pursuant to 28 U.S.C.

§ 1782, 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) (noting that a German court

"indisputably constitutes a foreign tribunal"). Lastly, as parties to the proceedings in the Dutch

Appellate Court, petitioners are clearly "interested persons." Intel, 542 U.S. at 256 ("No doubt

litigants are included among, and may be the most common example of, the 'interested

person[s]' who may invoke § 1782.").

---

[3] The parties are reminded that under the terms of Rule 72(a), if a party does not file timely objections to the district judge, that party may not raise on appeal any objections to this Opinion and Order.

## V.  EXTRATERRITORIALITY

Before proceeding to a discussion of the Intel factors with respect to petitioners' requests, we consider the parties' arguments with respect to the extraterritorial application of section 1782.  Based on the parties' submissions, it is not clear in which office the various documents being sought are located.  Petitioners assert that "the White & Case lawyers who are defending Russia against Petitioners' efforts to enforce the Arbitral Awards, including in the District of Columbia . . . must have some of the documents in their U.S. offices."  Pet. Reply at 15.  White & Case — which conducted a search — avers that they have found no responsive documents in the United States, except for billing and conflict records, see Paradise Decl. ¶¶ 5-7, 13, and believe it unlikely that responsive emails would be found in archived emails located in the United States, id. ¶ 7.  Nonetheless, White & Case affirms that there are "several boxes outside the United States which are labeled as relating to White & Case engagements for the Identified Clients . . . located in Europe and Russia."  Paradise Decl. ¶ 8.

The "canon of statutory construction known as the presumption against extraterritoriality" states that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016) (citing Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010)).   "The question is not whether we think 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so."  Id. (citing Morrison, 561 U.S. at 261).  "When a statute gives no clear indication of an extraterritorial application, it has none."  Id. (citing Morrison, 561 U.S. at 255); accord Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 115 (2013).  "This presumption 'serves to protect

against unintended clashes between our laws and those of other nations which could result in international discord.'" Kiobel, 569 U.S. at 115 (quoting EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991)); accord Nabisco, 136 S. Ct. at 2100. In addition, it "reflects the more prosaic 'commonsense notion that Congress generally legislates with domestic concerns in mind.'" Nabisco, 136 S. Ct. at 2100 (quoting Smith v. United States, 507 U.S. 197, 204 n.5 (1993)).

The Supreme Court has articulated a "two-step framework for analyzing extraterritoriality issues." Id. at 2101.

> At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

Id. "While the presumption can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential." Id. at 2102.

District courts in this Circuit are split over whether section 1782 may be applied extraterritorially to compel the production of documents stored overseas. Compare Purolite Corp. v. Hitachi Am., Ltd., 2017 WL 1906905, at *2 (S.D.N.Y. May 9, 2017) (no extraterritorial application); In re Application of Kreke Immobilien KG, 2013 WL 5966916, at *4 (S.D.N.Y. Nov. 8, 2013) (same); In re Godfrey, 526 F. Supp. 2d 417, 423 (S.D.N.Y. 2007) (same); In re Microsoft Corp., 428 F. Supp. 2d 188, 194 n.5 (S.D.N.Y. 2006) (same); with In re Accent

18

Delight Int'l Ltd., 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018) (extraterritorial application); In re Application of Eli Lilly & Co., 2010 WL 2509133, at *4 (D. Conn. June 15, 2010) (same); In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf, 2006 WL 3844464, at *5 (S.D.N.Y. Dec. 29, 2006) (same).

The Second Circuit has not yet ruled on this issue.  See Accent Delight Int'l Ltd., 696 F. App'x at 539.  Nonetheless, the Second Circuit has observed, in dicta, that while "[o]n its face, § 1782 does not limit its discovery power to documents located in the United States . . . there is reason to think that Congress intended to reach only evidence located within the United States." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997).  In a later decision, the Second Circuit seemed to assume, without holding, that section 1782 could not reach documents stored abroad, by reasoning that if discovery of a law firm's documents which were subject to a confidentiality order were allowed, "[i]n order to avoid potential disclosure issues under Section 1782, U.S. law firms with foreign clients may be forced to store documents and servers abroad, which would result in excessive costs to law firms and clients."  Kiobel, 895 F.3d at 247.

Notwithstanding this dicta, this Court finds the reasoning of those courts that have found that section 1782 does have extraterritorial application to be more persuasive, and better aligned with the Supreme Court's precedent on extraterritoriality generally.  In particular, this Court finds the Eleventh Circuit's reasoning in Sergeeva v. Tripleton Int'l Ltd., 834 F.3d 1194 (11th Cir. 2016) to be sound.  In that decision, the Eleventh Circuit cited with approval the district court's finding that section 1782 "plainly says that discovery is to be produced pursuant to the Federal Rules of Civil Procedure unless otherwise limited by court order," and that "the Federal Rules of Civil Procedure authorize extraterritorial document productions."  Sergeeva, 834 F.3d at 1200 (internal quotation marks omitted).  This reasoning is consistent with the Supreme

Court's decision in <u>Nabisco</u>. In that case, the Supreme Court held that while a statute must contain "a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential." <u>Nabisco</u>, 136 S. Ct. at 2102. <u>Nabisco</u> involved the application of the RICO statute to extraterritorial conduct. <u>Nabisco</u> reasoned while "Congress has not expressly said that § 1962(c) [of the RICO statute] applies to patterns of racketeering activity in foreign countries, . . . it has defined 'racketeering activity'—and by extension a 'pattern of racketeering activity'—to encompass violations of predicate statutes that <u>do</u> expressly apply extraterritorially." <u>Id.</u> The <u>Nabisco</u> Court stated that "[t]his unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." <u>Id.</u>

Here, section 1782(a) authorizes a court to order production of evidence "in accordance with the Federal Rules of Civil Procedure." While it is not laid out explicitly in the text of the Rules, it is well settled that "discovery pursuant to the Federal Rules of Civil Procedure . . . covers materials located outside of the United States." <u>Sergeeva</u>, 834 F.3d at 1200. As the Second Circuit has put it, a witness may not "resist the production of documents on the ground that the documents are located abroad. . . . The test for the production of documents is control, not location." <u>Marc Rich & Co., A.G. v. United States</u>, 707 F.2d 663, 667 (2d Cir. 1983) (citations omitted); <u>accord</u> <u>Tiffany (NJ) LLC v. Qi Andrew</u>, 276 F.R.D. 143, 147-48 (S.D.N.Y. 2011) ("If the party subpoenaed has the practical ability to obtain the documents, the actual physical location of the documents—even if overseas—is immaterial."). Given that section 1782 expressly provides that any discovery shall be taken "in accordance with the Federal Rules of Civil Procedure," we conclude that Congress intended that any order providing for discovery under section 1782 should accord with the procedures mandated by the Federal Rules of Civil

Procedure in all respects.  This includes the requirement that a party produce any documents within its possession and control, even those documents are located in a foreign country.

VI.  <u>DISCUSSION</u>

Keeping in mind that "[t]he <u>Intel</u> factors are not to be applied mechanically," <u>Kiobel</u>, 895 F.3d at 245, we consider them and "other pertinent issues arising from the facts of the particular dispute" to address the petitioners' application.

A.  <u>First *Intel* Factor</u>

The first <u>Intel</u> factor asks whether "the person from whom discovery is sought is a participant in the foreign proceeding," such that "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  <u>Intel</u>, 542 U.S. at 264.  White & Case is not a participant in the proceedings before the Dutch Appellate Court, either as a litigant or as counsel for the Russian Federation.  However, the Second Circuit has recognized that "when the real party from whom documents are sought . . . is involved in foreign proceedings, the first <u>Intel</u> factor counsels against granting a Section 1782 petition seeking documents from U.S. counsel for the foreign company."  <u>Kiobel</u>, 895 F.3d at 245 (citing <u>Schmitz v. Bernstein Liebhard & Lifshitz, LLP.</u>, 376 F.3d 79, 85 (2d Cir. 2004)); <u>accord</u> <u>In re Application of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding</u>, 2009 WL 3335608, at *5 (S.D.N.Y. Oct. 15, 2009) ("it is the foreign tribunal's ability to control the evidence and order production, not the nominal target of the § 1782 application, on which the district court should focus"); <u>In re Godfrey</u>, 526 F. Supp. 2d 417, 419 (S.D.N.Y. 2007) (citing <u>Microsoft</u>, 428 F. Supp. 2d at 188, for the <u>Intel</u> factors and characterizing the first factor as "[w]hether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid"); <u>Microsoft</u>, 428 F.

Supp. 2d at 194 ("While IBM and Cleary Gottlieb are not 'participants,' per se, in the underlying antitrust proceeding, all of the documents sought by Microsoft are within the Commission's reach. . . .  The relevant inquiry is whether the evidence is available to the foreign tribunal.  In this case, it is.").

Here, we must distinguish between two types of potential documents.  One type of document, which we will call Type 1 documents, are those that were generated at the time of White & Case's representation of Yukos in the 1998-2004 time period and that have remained in White & Case's continual custody since that time because of that representation.  The other type of document, which we will call Type 2 documents, are those documents that came into White & Case's possession because of their later representation of the Russian Federation in certain arbitration and other proceedings involving Yukos (though not the Dutch arbitration and litigation).  This representation arose from the Russian Federation's actions against Yukos beginning in 2003, including the ensuing arbitrations.  This latter representation appears to have begun in 2014.  See Meijer Decl. ¶ 9.  While petitioners contend that White & Case has access to such documents (including documents supplied to Russia in 2007), White & Case has affirmed that it has "established a screen that prevents personnel working on [the current representation of the Russian Federation] from accessing information of its former clients relating to Yukos and its affiliates."  Resp. Sur-Reply at 4 n.2.[4]

---

[4]  Our remarks herein regarding Type 2 documents apply equally to requests for deposition testimony to the extent the testimony would be based on knowledge acquired by lawyers in the course of their representation of Russia.

To the extent any document requests or requests for deposition testimony may be viewed as following outside these two categories, we view them as insufficiently relevant to the issue in the Dutch appellate proceeding.

As to the Type 2 documents, they are in White & Case's control only because White & Case is serving as counsel to the Russian Federation in other matters. Petitioners state that they are seeking these documents from White & Case, rather than from Russia, because Russia has historically refused to hand them over to petitioners, asserting that they are privileged because they are part of what petitioners believe to be a sham criminal investigation, see Second Leijten Decl. ¶ 54; Second Cotlick Decl. ¶ 40; because petitioners believe Russia would continue to make this argument if petitioners again requested the documents in the Dutch Courts, and the Dutch Courts might accept the argument, Second Leijten Decl. ¶ 55; and because, even if Russia were ordered to hand documents over by a Dutch court, Russia would likely disobey the order, id. ¶¶ 57-58.

Petitioners suggest that under Intel the "relevant inquiry" should end upon determining that White & Case itself is not a party to the Dutch Litigation. See Pet. Reply at 10-11. But this argument ignores the fact that the Type 2 documents were given to White & Case by Russia after Russia became its client and are currently in White & Case's hands because of the attorney-client relationship between Russia and White & Case. Russia, of course, is a party to the Dutch Proceeding. Thus, as to these documents, the request is in essence an effort to obtain the documents from Russia.

Certainly we recognize that the transfer of the documents by Russia to White & Case in connection with its current representation does not by itself operate to make them privileged. See Pet. Mem. at 36 n.16 (citing Fisher v. United States, 425 U.S. 391, 404 (1976)). But policy considerations articulated in Kiobel apply to this situation to the extent that attorneys located in the United States should not have to fear that section 1782 will be used to require them to produce materials belonging to their foreign client. We thus view the first Intel factor as

23

strongly disfavoring requiring any production of documents from White & Case that came into their possession solely in relation to their representation of Russia in the later proceedings — that is, the Type 2 documents.

As for the Type 1 documents — that is, responsive documents that are not in White & Cases's possession solely because of their representation of the Russian Federation — White & Case is not a participant in the Dutch proceedings. Thus, we find that the first Intel factor supports production of the Type 1 documents.

### B. Second *Intel* Factor

As to the second Intel factor, petitioners note that Dutch law permits the submission of evidence collected through section 1782 and provide examples of cases in which such evidence has been admitted. See Leijten Decl. ¶¶ 18-20; Second Leijten Decl. ¶¶ 63-64 & n.7. In particular, petitioners note that in a different "Yukos-related proceeding, the [Dutch] Court of Appeal allowed . . . Section 1782 evidence to be submitted during the appeal phase, even though it was not previously submitted to the Dutch District Court." Second Leijten Decl. ¶ 64.

Respondents argue that the Second Circuit in Kiobel held that "the Netherlands' more restrictive discovery practices' weigh against Section 1782 applications under the second Intel factor." Resp. Opp. at 25 (quoting Kiobel, 895 F.3d at 244). We disagree with this characterization of Kiobel's holding. Kiobel found that under the "third" (not the second) Intel factor, "statements made by Kiobel's counsel demonstrate that Kiobel is trying to circumvent the Netherlands' more restrictive discovery practices." 895 F.3d at 245. The Second Circuit did not hold that Dutch courts are generally unreceptive to evidence obtained through section 1782. Respondents also cite an amicus brief submitted in Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013), in which the Netherlands expressed its objection to the United States "deciding

civil cases involving foreign parties where there is no significant nexus to the U.S.," and noted its disfavor for broad American discovery procedures that tend to drive up litigation costs. Resp. Opp. at 25 (citing Brief of the Governments of the Kingdom of the Netherlands and the United Kingdom of Great Britain and Northern Ireland as <u>Amici Curiae</u> in Support of Neither Party, <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 569 U.S. 108 (2013), 2012 WL 2312825, at \*24, \*27). This brief, however, makes no mention of section 1782 discovery and is not relevant to the question of whether the Dutch Appellate Court would be receptive to receiving the discovery sought here.

Accordingly, we conclude that the second <u>Intel</u> factor favors production.

C. <u>Third *Intel* Factor</u>

The third factor asks "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." <u>Kiobel</u>, 895 F.3d at 244 (citing <u>Intel</u>, 542 U.S. at 264-65). We do not address this factor with respect to the Type 2 documents because the weight of the other factors so powerfully persuades us that production of the Type 2 documents would not be appropriate.

As to the Type 1 documents, respondents argue that the documents should have been sought through proceedings in the Netherlands and Russia. Resp. Opp. at 26. The Second Circuit, however, has repeatedly made clear that there is no "exhaustion" requirement under section 1782. <u>See</u>, <u>e.g.</u>, <u>Mees v. Buiter</u>, 793 F.3d 291, 303 (2d Cir. 2015); <u>In re Application for an Order Permitting Metallgesellschaft AG to take Discovery</u>, 121 F.3d 77, 79 (2d Cir. 1997). Also, it is unclear to what extent Russia has possession of the Type 1 documents. Thus, we find that this factor favors production.

D. <u>Delay</u>

Respondents have raised an issue that does not fit precisely within any of the Intel factors (though it implicates the fourth factor) but that we deem to be a significant consideration: the timing of petitioner's section 1782 application.  Respondents contend that the section 1782 application could and should have been presented to this Court many years ago and that this delay strongly counsels against granting the application.  See Resp. Opp. at 20-21.

This issue arises from the Russian Federation's assertion in the Dutch proceedings that the petitioners here acted with "unclean hands" when they first acquired their shares of Yukos. As petitioners explain, the Russian Federation's "unclean hands" allegations state that "Petitioners allegedly committed, or were implicated by, various illegalities before, during and after the making of their investments in Yukos."  Leijten Decl. ¶ 21.  Petitioners acknowledge that "unclean hands" allegations were made during the arbitral proceedings, see id. ¶ 11; Second Leijten Decl. ¶ 11, but argue that a new allegation was made in 2017.  Specifically, they allege that in its November 28, 2017, "Statement of Defence" submitted to the Dutch Appellate Court, for "the first time . . . the Russian Federation accused Petitioners themselves of using the Tempo Agreements to bribe Russian public officials . . . in exchange for their alleged help in obtaining shares of Yukos during the privatization [of Yukos] (the "Bribery Allegation")."  Second Leijten Decl. ¶ 4.

In the November 28, 2017, Statement of Defence, Russia argued that between 1996 and 2003, "YUL [Yukos Universal Limited], one of the appellants in these proceedings, played a pivotal role in making" a series of payments from the "Russian Oligarchs" — a group of individuals that Russia claims control petitioners, see Final Arbitration Award at xv — to the "Red Directors," which is Russia's term for a group  public officials who were tasked with overseeing Yukos' privatization, see Statement of Defence (annexed as Ex. 4 to Leijten Decl.)

("Statement of Defence"), ¶¶ 534-35; see also Meijer Decl. ¶ 12(iii)(b) (defining the phrase "Red Directors").  In particular, the Russian Federation alleged that "[t]he Russian Oligarchs used YUL's bank accounts to pay at least USD 613.5 million to the Red Directors over the years 1996 until 2003."  Statement of Defence ¶ 535.  These payments were allegedly made to compensate the Red Directors for their assistance in unlawfully rigging the auction of Yukos' shares in the mid-1990s to favor the Oligarchs; that is, "sham" contracts were allegedly used to facilitate payment from the Oligarchs to the Red Directors for assistance in helping the Oligarchs acquire their Yukos shares, see id. ¶¶ 517-38, which Russia alleges were ultimately transferred to petitioners, see id. ¶546.  As petitioners explain, "[t]wo of these supposed 'sham' contracts were entered into by GML (the parent company of petitioners Hulley and YUL), the aforementioned 'public officials,' and a company called Tempo Finance Limited in 2002."  Pet. Mem. at 12.   In addition, in its 2017 Statement of Defence, the Russian Federation argues that "the Russian Oligarchs' own advisors thought the 'agreements' lacked any basic economic rationale."  Id. ¶ 536.  The documents cited by Russia in support of this contention show that the "advisors" include the law firms of Akin Gump, Cleary Gottlieb, and Clifford Chance, as well as the auditing firm PricewaterhouseCoopers.  See Declaration of Dmitry Gololobov, dated July 26, 2016 (annexed as Ex. 9 to Second Leijten Decl.) ("Gololobov Decl.") ¶¶ 48-49; Expert Report Analyzing Documentary Evidence of Bribery, Corruption, and Money Laundering Pertaining to the Privatization of OAO YUKOS Oil Company, dated Jan. 27, 2017 (annexed as Ex. 6 to Leijten Decl.) ("First Pieth Decl."), ¶¶ 75-79.  There is no mention of White & Case, however.

Before even considering the issue of delay, we repeat that White & Case has affirmed that "there are no client matters for or referencing Tempo Finance" and that "billing records do not reflect work performed with respect to Tempo Finance or with respect to any agreement

involving Tempo Finance."  Paradise Decl. ¶ 11.  That the Russian Federations' documents reference the opinions of other law firms regarding the Tempo Agreements, but not White & Case, see Gololobov Decl. ¶¶ 48-49; First Pieth Decl. ¶¶ 75-79, corroborate this affirmation.

In any case, a review of the Russian Federation's arbitration and district court submissions show that the "Bribery Allegation" is not new.  It is undisputed that the Russian Federation raised the issue of petitioners' "unclean hands" throughout the arbitration process, as early as 2005.  See Final Arbitration Award ¶¶ 1273-90 (describing Russia's "unclean hands" allegations and noting that the Tribunal first addressed them in an interim decision in 2006); Meijer Decl. ¶ 12(I) (stating that Russia's initial pleading submitted on October 15, 2005, expressly raised the "unclean hands" defense).  The Russian Federation first raised the issue of "sham contracts" in 2011 in its "Counter-Memorial " submitted to the Dutch Tribunal.  Meijer Decl. ¶ 12(iii)(b).  In this submission Russia cited the Tempo Agreements as "highly damning proof that Menatep [GML] had conspired with pre-existing Yukos management to facilitate the unlawful acquisition of Yukos by the Oligarchs."  Russian Federation Counter Memorial (annexed as Ex. RSM-9 to Meijer Decl.) ("Counter-Memorial"), ¶ 36.  The Counter-Memorial noted that the agreement was between "Yukos Universal" and the individuals the Russian Federation later termed the "Red Directors," though the Counter-Memorial refers to them by their names.  See id.; see also Meijer Decl. ¶ 12(iii)(b) (listing the names of the "Red Directors").  The Counter-Memorial alleged that in 2002, Yukos' auditor PricewaterhouseCoopers became suspicious of the agreement, "suspecting that it was a 'kickback' that had been previously promised to [the 'Red Directors'] for helping Menatep acquire Yukos" during the mid-1990s privatization auction.  Counter-Memorial ¶ 36.  In 2014, the Arbitral Tribunal took note of this allegation, including it in a list of alleged "illegal and bad

faith conduct" that the Russian Federation alleged against petitioners under the heading of "Claimant's Alleged Unclean Hands." Final Arbitration Award, ¶ 1283(v). The Russian Federation then re-iterated this allegation in its 2015 "Statement of Reply" filed in the Dutch District Court. See Statement of Reply, In the Matter of the Russian Federation versus Veteran Petroleum Limited et al., dated Sept. 16, 2015 (annexed as Ex. 1 to Second Paradise Decl.), ¶ 28(a)(v) & n.8. Accordingly, all of the key elements of the "Bribery Allegation," including the use of Yukos Universal Limited to make payments, were made as early as 2001 and in any case years before the filing of the 2017 Statement of Defence.

Petitioners make several arguments in support of their contention that the "Bribery Allegation" was newly raised on appeal. They argue that the Bribery Allegation "is made in connection with an entirely new ground for setting aside the Arbitral Awards": namely, the argument that upholding the arbitral awards would violate Dutch public policy. Second Leijten Decl. ¶ 5. Petitioners point to an "Interim Judgment," issued on December 18, 2018, in which the Dutch Appellate Court noted that "[i]t is not in dispute that in the defence on appeal the Russian Federation put forward the unclean hands argument for the first time in support of its reliance on Article 1065(1)(3)(e) DCCP (public policy)." Judgment, the Hague Court of Appeal, dated Dec. 18, 2018 (annexed as Ex. A to Pet. Not. Supp. Authority), ¶ 2.6. The Dutch Appellate Court noted that this argument was not addressed in the Russian Federation's statement of appeal, and that "the Russian Federation submitted a large number of exhibits and brought and argued its case considerably more broadly than in the first instance." Id. Accordingly, the Dutch Appellate Court ruled that petitioners shall have "the opportunity to respond by deed" to the passages of the Russian Federation's appeal that relate to the unclean hands argument, and "within the framework of that response, to present exhibits." Id.

Respondents note – and we agree — that this decision conveys only that the unclean hands argument was first invoked in support of the "public policy" defense. See Holwell Letter. It says nothing about whether the unclean hands argument was offered in support of other defenses. As just discussed, the unclean hands argument, including what is now characterized as the "Bribery Allegation," was made during the arbitral proceedings in 2011 and was raised again before the district court.

Petitioners argue that the "Bribery Allegation" is supported by newly-submitted evidence, consisting of two new witness statements and three new expert reports from two experts. Second Leijten Decl. ¶ 6; see also Leijtan Decl. ¶¶ 23-24. In particular, petitioners point out that some of these witness statements suggest that in 2002 and 2003, Yukos' external advisors were suspicious of or objected to the Tempo Agreements and the manner in which Yukos had been privatized. See Second Leijten Decl. ¶ 7 (referring to Gololobov Decl. ¶ 48); Leijten Decl. ¶ 24 (citing First Pieth Decl.), ¶¶ 75-79). We do not find this point persuasive, however, because these newly submitted statements and declarations do not mention White & Case among the objecting external advisors, and so their recent submission does not give justification for seeking discovery from White & Case at this stage in the litigation.

Petitioners next argue that during the arbitrations, the Russian Federation never made a "Bribery Allegation" against petitioners, but rather made bribery allegations against third parties, and took issue only with petitioners' conduct after they acquired their Yukos shares. Second Leijten Decl. ¶ 12. As already discussed, however, the Russian Federation argued in 2011 that petitioner Yukos Universal Limited was used by the "Oligarchs" to pay a "kickback" or "bribe" to the "Red Directors" in 2002. Counter-Memorial ¶ 36. The newly-submitted Statement of Defence does not articulate a more active role for petitioners. In addition, while petitioners

30

maintain that the "Russian Oligarchs," as well as officials at Bank Menatep are separate and distinct from themselves — a view the Tribunal indeed agreed with, see Final Arbitration Award ¶ 1370 — what matters, as was made clear in the 2014 arbitration decision, is that the Russian Federation had alleged that wrongful conduct by the "Oligarchs" should be attributed to petitioners. See, e.g., Final Arbitration Award ¶ 1281 (listing the Russian Federation's allegations of "28 instances of 'illegal and bad faith conduct' by Claimants or 'attributable to' Claimants involving a variety of actors and spanning over ten years") (emphasis added).

Finally, while petitioners acknowledge that the Tempo Agreements were "mentioned during the arbitrations," they contend that "they were not the basis for . . . any allegation that Petitioners paid bribes in connection with obtaining their investments in Yukos," but were "[i]nstead . . . raised as a collateral issue in the course of the parties' dispute over whether Yukos was guilty of 'tax evasion.'" Second Leijten Decl. ¶¶ 21-22. However, the Tribunal's Final Arbitration Award in 2014 makes clear that allegations of impropriety related to the Tempo Agreements were "related to the acquisition of Yukos by Bank Menatep; and the so-called 'Oligarchs' and their subsequent consolidation and control and ownership over Yukos and its subsidiaries." Final Arbitration Award ¶ 1283.

Accordingly, it is clear that the "new" Bribery Allegation is essentially the same allegation regarding the use of Yukos Universal Limited to pay a "kickback" that the Russian Federation first brought in 2011, as was verified by the 2014 arbitration decision. Yet no action was taken to obtain evidence from White & Case until 2017. While delay is not specifically listed as an Intel factor, the Second Circuit has made clear that a request for assistance under section 1782 that is "inexcusably untimely" would not provide an "efficient means of assistance to the foreign proceedings," which is one of the twin aims of the statute. Nascimento v. Faria,

600 F. App'x. 811, 812 (2d Cir. 2015) (summary order); <u>accord</u> <u>In re Nascimento</u>, 2014 WL 4457141, at *1 (S.D.N.Y. May 13, 2014). Other case law makes clear that delay appropriately counsels against providing section 1782 assistance when a court determines whether to exercise its discretion under section 1782. <u>See</u>, <u>e.g.</u>, <u>In re TJAC Waterloo, LLC</u>, 2016 WL 1700001, at *3 (N.D. Ind. Apr. 27, 2016) ("[E]ven if this Court retained jurisdiction, [petitioner's] discovery request is untimely and seeks information beyond the appropriate scope of discovery."); <u>In re Caratube Int'l Oil Co., LLP</u>, 730 F. Supp. 2d 101, 106 (D.D.C. 2010) (weighing fact that petitioner never raised need for non-party discovery, where foreign tribunal set a detailed discovery schedule over a year prior to filing of section 1782 petition, against petitioner in exercising discretion); <u>Aventis Pharma v.Wyeth</u>, 2009 WL 3754191, at *1 (S.D.N.Y. Nov. 9, 2009) ("this Court would not be providing 'efficient means of assistance' to the litigants or [foreign] Courts by allowing [Petitioners] to rush to a U.S. Court on the eve of an appeal in the hopes of obtaining discovery it could have requested in this same Court starting over five years ago"); <u>In re Degitechnic</u>, 2007 WL 1367697, at *5 (W.D. Wash. May 8, 2007) ("Given [petitioner's] complete failure to justify the timing of this request, the Court finds little difficulty with the idea that the instant discovery proceedings will unduly burden [respondent]."). Thus, we consider the fact that petitioners were on notice as early as 2011 that Russia was making allegations that the petitioners improperly acquired their shares in Yukos and yet took no action to obtain the evidence from White & Case during the many years the arbitration was pending or in the proceedings in the Dutch district court. The longer the delay in seeking documents, the greater burden is imposed on parties expected to respond to the document requests, who now must attempt to reconstruct events from the distant past — in this case, more than 16 years ago. Petitioners' delay thus disfavors a grant of their section 1782 application.

E.  Fourth *Intel* Factor

The Fourth factor asks whether the section 1782 request is "'unduly intrusive or burdensome.'"  <u>Kiobel</u>, 895 F.3d at 244 (quoting <u>Intel</u>, 542 U.S. at 264-65).  The Second Circuit has held that "a district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  <u>Mees</u>, 793 F.3d at 302.  "[U]nduly intrusive or burdensome requests may be rejected or trimmed."  <u>Intel</u>, 542 U.S. at 265.  We address this factor as necessary in our analysis of the request in the next section.

F.  <u>Ruling</u>

After considering the circumstances of the petitioners' request in light of the <u>Intel</u> factors and other considerations we have discussed (and also for reasons given below), we are firmly of the belief that we should not exercise our discretion to allow any discovery of Type 2 documents or of deposition testimony based on White & Case's current representation of Russia.

As for the Type 1 documents and requests for deposition testimony relating to White & Case's earlier representation of Yukos and its related entities, we view the delay that occurred in making an application to this Court as disfavoring granting the application notwithstanding the favorableness of other <u>Intel</u> factors.  But there are other considerations here, which partially come under the rubric of the fourth <u>Intel</u> factor, that more strongly counsel against granting the application.

The documents sought are documents that arose from White and Case's representation of Yukos and related entities.  As <u>Kiobel</u> notes, "[a] law firm's representation of a foreign client is a factor worth considering" as a discretionary factor.  895 F.3d at 244.  The parties appear to agree that any privilege applicable to the Type 1 documents arises under Russian law.  Indeed,

the parties have each submitted affidavits of experts on Russian law on the question of whether Russian law permits White & Case to disclose the materials sought by the subpoena. White & Case's expert maintains that the materials generated as a result of White & Case's representation are protected by two separate doctrines — essentially, a representative-client privilege and a contractual obligation to maintain secrecy. Schwarts Decl. ¶¶ 8-12, 19-21. Petitioners' expert vehemently disagrees with the conclusion of White & Case's expert. See Rachkov Decl.; Second Rachkov Decl. We have read these expert declarations carefully. Both experts have excellent credentials and each side makes cogent arguments in favor of its interpretation of Russian law. Neither side cites a rule or case that accounts for all the factual circumstances present here. The treatment of the documents sought by the subpoena appears to be an unsettled question under Russian law. Notably, even under the view of petitioners' own expert, documents may potentially be disclosed only by means of an order that complies with Russian law, including certain procedural requirements such as a "closed hearing." Second Rachkov Decl. ¶¶ 22-28. Additionally, it is not clear what substantive standards would govern the issuance of a disclosure order that complies with Russian law.

In our view, this lack of clarity favors denying the section 1782 application. We believe it to be "unduly intrusive or burdensome," to quote the fourth Intel factor, to require an American law firm with an office in a foreign country to potentially be directed to act in contravention of that foreign country's law. Additionally, in light of the lack of clarity in Russian law, we are trouble by the prospect of issuing an order that potentially results in treating an American law firm with a presence in a foreign country differently from how a law firm in that country with no American office would have been treated by a Russian court.

Petitioners argue that any lack of clarity as to Russian law must be viewed as supporting

their application, asserting that the Second Circuit requires "authoritative proof" of foreign privilege to justify denial of a section 1782 application. Pet. Mem. at 26 (citing Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1100 (2d Cir. 1995)); accord Metallgesellschaft, 121 F.3d at 80. The reference to "authoritative proof" in the case law, however, is proof that "a foreign tribunal would reject evidence obtained with the aid of section 1782." Euromepa, 51 F.3d at 1100. Here, we have not been provided authoritative proof that the Dutch Appellate Court would reject the evidence sought by the petition and thus this doctrine does not apply.

A second consideration operates here. If American courts entertain applications to obtain client documents and attorney depositions from American law firms with foreign offices, it will discourage foreign clients from engaging the foreign office of an American law firm for fear that American courts would order production of documents and depositions of attorneys that not might not be ordered by the country where the client is located. This would have a chilling effect on the ability of American law firms with foreign offices to provide representation to foreign clients.

Examining the "twin aims" of section 1782 — that is, "providing efficient means of assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts," Intel, 542 U.S. at 252 — we find that granting the instant application would do little to further these purposes. To consider this question, we posit an applicant seeking to obtain documents that arose from a representation by the American law office of a Russian law firm. The representation at issue by the American law office is of an American client and is governed by American law, about which American lawyers disagree. The documents are alleged to have been generated for the American office and to be located largely in America. It could not reasonably be viewed as "efficient" for a Russian court

to entertain a proceeding in Russia in which the applicant seeks to have a Russian court apply American law to determine whether the documents must be produced. We would also not view a Russian court declining to entertain such an application as inappropriately denying assistance. We thus do not believe that a denial of the instant application would discourage other countries in the future from supplying appropriate assistance to courts in the United States.

We note that the instant application is an unusual one because most section 1782 applications seek documents that are exclusively subject to United States legal doctrines. Here, by contrast, the documents originated pursuant to a representation in Russia and the parties do not dispute that Russian law governs their disclosure. Given the uncertainty as to how Russian law would treat the documents at issue and whether White & Case's disclosure of the documents would comply with Russian law, and given the policy considerations just discussed, we do not believe this case warrants an exercise of discretion to require White & Case to produce even the Type 1 documents or witnesses for depositions as to the representation that generated those documents.

Petitioners argue that it would be "perverse" to allow White & Case to invoke any privilege over the documents because such an invocation would help the very entity that destroyed Yukos to "escape from the justice sought by Yukos' former majority shareholders." Pet. Mem. at 22. This argument might have some force if petitioners made it in a proceeding to which Russia was a party. Russia is not a party to this proceeding, however, and White & Case is not responsible for its conduct. In this case, it is White & Case, not Russia, that is being put into the position of potentially not complying with Russian law. Notably, petitioners make no argument that Russian law regarding the disclosure of documents would take into consideration the purpose for which the documents would ultimately be used. Thus, we do not see why the

ultimate use to which the disclosures would be used, and the benefits that would inure to particular parties from non-disclosure, are relevant.

For the above reasons, we conclude that, in combination with the other factors and considerations we have mentioned, we will deny the petitioners' application not only as to the Type 2 documents and depositions but as to all documents and depositions.

VII. CONCLUSION

For the reasons stated above, petitioners motion pursuant to section 1782 (Docket # 7) is denied.

SO ORDERED.

Dated: February 19, 2019

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

37